*Kennard Carter v. State of Maryland*, No. 478, September Term 2018.

## ARREST > NECESSITY FOR CAUSE FOR ARREST

For the purposes of ascertaining whether Fourth Amendment guarantees against unreasonable searches and seizures are implicated in an encounter between an individual and a police officer, the encounter is classified as investigatory detention when, in view of all the circumstances surrounding the incident, by means of physical force or show of authority, a reasonable person would have believed that he was not free to leave or is compelled to respond to questions. U.S. Const. amend. IV.

## ARREST > WHAT CONSTITUTES A SEIZURE OR DETENTION

Factors that might indicate that a seizure has occurred, thus implicating Fourth Amendment guarantees against unreasonable searches and seizures, include: threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person, the use of language or tone of voice indicating that compliance with the officer's request might be compelled, approaching the individual in a nonpublic place, and blocking the individual's path. U.S. Const. amend. IV.

## ARREST > WHAT CONSTITUTES A SEIZURE OR DETENTION

Crucial test in determining whether a person was seized within the meaning of the Fourth Amendment is whether, taking into account all of the circumstances surrounding the encounter between the individual and the police, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business. U.S. Const. amend. IV.

## CRIMINAL LAW > ATTENUATION OR DISSIPATION PURGING TAINT

Evidence is admissible under the "attenuation doctrine" when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.

## CRIMINAL LAW > ATTENUATION OR DISSIPATION PURGING TAINT

Three factors guide the court's analysis into whether the attenuation doctrine applies to allow admission of evidence obtained following unconstitutional conduct: (1) the court looks to the temporal proximity between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search; (2) the court considers the presence of intervening circumstances; and (3)

particularly significant, the court examines the purpose and flagrancy of the official misconduct. U.S. Const. amend. IV.

Circuit Court for Baltimore City
Case No. 117303014

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 478

September Term, 2018

_____

KENNARD CARTER

v.

STATE OF MARYLAND

_____

Leahy,
Reed,
Friedman,

JJ.

_____

Opinion by Reed, J.

_____

Filed: November 14, 2019



 Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.

Suzanne C. Johnson, Clerk

Kennard Carter ("Appellant") was charged with (1) possession of a firearm after having been convicted of a crime of violence; (2) possession of a firearm after having been convicted of a disqualifying crime; (3) wearing, carrying, and transporting a handgun on his person; (4) possession of a controlled dangerous substance (cocaine); and (5) resisting arrest.[1] Prior to trial, defense counsel stipulated that Appellant had a prior conviction that disqualified him from possessing a weapon.

At trial, Appellant's counsel filed a Motion to Suppress physical evidence seized by Maryland Transit Administration ("MTA") officers subsequent to Appellant being removed from a Light Rail Train. The Motion claimed that Appellant's Fourth Amendment right to be free from unreasonable searches and seizures had been violated. Following the suppression hearing, the Court denied Appellant's Motion to Suppress.

On March 26, 2018, a jury in the Circuit Court for Baltimore City convicted Appellant of Counts 1, 3, and 5.[2] Appellant was then sentenced to ten (10) years' imprisonment as to Count 1, suspending all but a mandatory minimum of five years without the possibility of parole, and to concurrent three-year (3) terms on Counts 3 and 5, with three (3) years' supervised probation. This appeal followed.

In bringing his appeal, Appellant presents one question for appellate review:

I.      Did the trial court err in denying Appellant's Motion to Suppress?

---

[1] Appellant was also charged with failure to pay for the Light Rail Train but the charge was dropped by the State once Appellant prayed a jury trial.

[2] The trial court granted judgments of acquittal as to Counts 2 and 4.

For the following reasons, we hold that Appellant was illegally seized. Furthermore, we hold that Appellant's Motion to Suppress should have been granted, as the *Strieff* factors weigh against attenuation in this case. As such, we reverse the convictions of Appellant.

**FACTUAL & PROCEDURAL BACKGROUND**

On October 2, 2017, at approximately 8:00 p.m., six Maryland Transportation Authority ("MTA") officers[3] gathered on the Mount Royal station platform and waited for the train to arrive in order to conduct a fare inspection. Fare inspections, also referred to as "fare sweeps," are used by MTA officers to check whether passengers have committed the crime of not paying their fare. Anyone who travels on a Light Rail Train without paying their fare is subject to a fifty-dollar ($50) citation pursuant to Maryland Code, Transportation Article § 7-705.

Fare inspections are typically conducted by teams of MTA officers, where the officers broadcast an announcement through the train that a fare inspection is being conducted while the train is stopped and instruct all passengers to show their passes when approached. There was no evidence establishing whether any signs warning passengers that they would be subject to being checked for payment for a possible violation of the Transportation Article were posted at the station or on the train. At that time, some officers walked through the train seeking proof of payment from each passenger; the remaining

---

[3] Officer Tobin testified that the MTA is sanctioned by the State of Maryland, and MTA officers are empowered with the same arrest powers as those granted to the Maryland State Police. Md. Code, Trans. § 4-208(a)(2) ("a Maryland Transportation Authority police officer has all the powers granted to a peace officer and a police officer of this State"); s*ee also Okwa v. Harper*, 360 Md. 161 (2000).

2

officers remained on the platform outside the train. During the suppression hearing in this matter, Corporal Latoya Russell (hereinafter "Corporal Russell") testified that passengers are not allowed to leave the train while the inspections are conducted. Any passenger who refuses, or is unable, to produce their fare ticket is ordered off the train and directed to the officers on the platform to receive a citation. Corporal Russell also testified that officers typically collect identifying information and run warrant checks through MTA dispatch on every passenger who receives a citation for traveling without a fare ticket. Furthermore, when later asked, Corporal Russell answered in the affirmative that fare inspections are "an apparatus to be able to check people for warrants."

As a Light Rail Train arrived at the Mount Royal station on October 2, 2017, an officer boarded each of the four train cars. Each officer broadcasted an announcement that they were about to conduct a fare inspection and instructed passengers that officers were checking tickets. The officers then proceeded to ask every passenger onboard for their ticket.

Appellant was travelling in one of the train cars boarded by MTA officers on October 2, 2017. After Corporal Russell boarded Appellant's car, Appellant approached Corporal Russell and informed her that he did not have a ticket. Corporal Russell then instructed Appellant to get off of the train and directed him to Officer Zachary Tobin, who was waiting on the platform. Officer Tobin then escorted Appellant to a bench on the platform, where he remained until the Light Rail Train departed from Mount Royal station.

Once the train left the Mount Royal station, Officer Tobin collected Appellant's name, date of birth, and social security number. Officer Tobin then provided that

3

information to MTA dispatch, who informed Officer Tobin that Appellant had a possible positive arrest warrant. At that time, Appellant attempted to get up from the bench where he had been sitting and leave the platform, prompting three officers to tackle Appellant. During the ensuing melee, Officer Tobin yelled that Appellant had a gun. In response, Corporal Russell utilized her taser to subdue Appellant until Officer Tobin was able to fully handcuff Appellant.

After Appellant was handcuffed, Officer William Camphor searched Appellant and found ten bags of white powder. Officers also located a gun and bullets in the track area, which were introduced into evidence at Appellant's trial. The officers then transported Appellant to Central Booking, where it was confirmed that a warrant existed for Appellant's arrest. Appellant was subsequently charged with (1) possession of a firearm after having been convicted of a crime of violence; (2) possession of a firearm after having been convicted of a disqualifying crime; (3) wearing, carrying, and transporting a handgun on his person; (4) possession of a controlled dangerous substance (cocaine); and (5) resisting arrest.

At Appellant's trial, Appellant's counsel filed a Motion to Suppress the physical evidence found on Appellant and in the track area on the ground arguing that Appellant's Fourth Amendment right to be free from unreasonable searches and seizures had been violated. Denying the motion, the court ruled that Corporal Russell had "engaged in a mere accosting by announcing the fare inspection, and therefore [her] inquiry did not require Fourth Amendment justification." The trial court further reasoned that "after the fare inspection was announced, [Appellant] voluntarily approached Corporal Russell" to

4

confess he did not have a fare ticket, thus providing MTA officers probable cause to detain him and conduct the warrant check which ultimately led to his arrest. The court also stated that even had Corporal Russell's actions been an unlawful investigatory stop, "the discovery of a valid, pre-existing warrant attenuated the connection between the unlawful stop and the evidence seized from [Appellant] incident to arrest."

On March 26, 2018, a jury convicted Appellant of possession of a firearm with a disqualifying conviction; wearing, carrying, and transporting of a handgun on his person; and resisting arrest. That day, Appellant was sentenced to ten years' imprisonment with all but five years suspended for the possession of a firearm conviction, without the possibility of parole, and two concurrent three-year sentences for the second and third convictions. Appellant was also sentenced to three years of supervised probation once released.

## STANDARD OF REVIEW

In reviewing a trial court's decision to grant or deny a motion to suppress, this Court limits its review to the record of the motions hearing. *Trusty v. State,* 308 Md. 658, 669–72 (1987). The evidence is viewed in the light most favorable to the prevailing party, and the trial court's fact findings are accepted unless clearly erroneous. *Williamson v. State,* 413 Md. 521, 531 (2010). "The ultimate determination of whether there was a constitutional violation, however, is an independent determination that is made by the appellate court alone, applying the law to the facts found in each particular case." *Belote v. State,* 411 Md. 104, 120 (2009) (citations omitted); *see also Carter v. State,* 367 Md. 447, 457 (2002).

## DISCUSSION

5

## A. Parties' Contentions

Appellant contends that he was unconstitutionally seized by MTA officers on October 12, 2017. Appellant further contends that his encounter with Corporal Russell was a nonconsensual encounter based on Corporal Russell's show of authority upon entering the train car. As there was no probable cause to believe that he or anyone else aboard the train had committed any crime prior to that point, Appellant asserts that Corporal Russell violated his Fourth Amendment rights. Furthermore, Appellant emphasizes that the MTA officers were acting with a primarily law enforcement purpose when boarding the Light Rail Train.

Appellant objects to the trial court's conclusion that Corporal Russell had merely accosted him prior to Appellant voluntarily confessing his failure to purchase a fare ticket. Appellant asserts that the illegal seizure began the moment Corporal Russell entered the train car, and case law establishes that consent to search is invalid if such consent is preceded by an illegal seizure. Appellant further rejects the trial court's reliance on the typical nature of fare inspections; Appellant argues that the absence of particularized suspicion on the part of MTA officers makes their conduct more objectionable than the trial court believed.

Finally, Appellant asserts that the discovery of a valid arrest warrant against Appellant does not attenuate the taint created by the alleged illegal seizure. Citing *Brown v. Illinois*, 422 U.S. 590 (1975), Appellant claims that his alleged seizure was too temporally proximate to the discovery of the warrant, there was no intervening circumstance between those two events, and the alleged misconduct committed by

6

Corporal Russell was too flagrant to allow for the attenuation doctrine to apply. In relying on *Utah v. Strieff*, 136 S. Ct. 2056 (2016), Appellant concludes that the MTA's "suspicionless fishing expeditions" are strictly prohibited by the Fourth Amendment. As such, Appellant believes that the trial court erred in denying his Motion to Suppress.

The State argues that Appellant and Corporal Russell's interaction constitutes a voluntary encounter and not a seizure. The State emphasizes the lack of evidence supporting Appellant's accusation that the MTA officers showed authority or that Appellant could not leave freely at any point prior to his arrest. The State also contends that fare inspections are voluntary under the principle of implied consent. Specifically, the State asserts that "societal norms" exist and that reasonable individuals using the Light Rail Train understand that they are expected to pay for a fare ticket and be ready to provide proof upon request. The State turns to the video evidence presented at trial and the signage around Mount Royal station indicating the requirement that patrons buy fare tickets prior to traveling on the Light Rail Train.

Even if Corporal Russell's actions constituted a seizure, the State asserts that such a seizure was reasonable. The State compares the MTA's action with a sobriety checkpoint to show that warrantless seizures have been deemed constitutional in the past. It also rejects Appellant's reliance on *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000), by emphasizing that while *Edmond* rejected seizures whose purpose is to reveal if a motorist committed any crime, the MTA's fare inspections were tailored solely towards finding those who violated Md. Code, Trans. § 7-705. As such, the State contends that the facts in this matter are highly distinguishable from those in *Edmond*.

7

Finally, the State disputes Appellant's contention that the discovery of his arrest warrant did not attenuate the taint had Appellant been illegally seized. Rejecting Appellant's interpretation of *Strieff*, the State believes that an intervening circumstance existed, the discovery of Appellant's positive arrest warrant, prior to finding the evidence Appellant seeks to suppress. Because officers are required by law to arrest individuals who have active warrants, the arrest of Appellant was a compelling "intervening circumstance" under *Strieff*. Furthermore, the state contends that the MTA officers' conduct was not "flagrant," but instead a "negligibly burdensome precaution for officer safety." The State also emphasizes that fare inspections are not implemented for the sole purpose of engaging in warrant checks. As such, even had Appellant been illegally seized, the State contends that discovery of his arrest warrant attenuated any taint of the illegal seizure.

We agree with Appellant that he was illegally seized by Corporal Russell prior to Appellant voluntarily admitting he did not possess a fare ticket. Furthermore, after a review of the facts and testimony presented at the motion hearing, we find that the attenuation doctrine is inapplicable here. As such, Appellant's Motion to Suppress should have been granted.

## B. Analysis

### *i. Unlawful Seizure*

The Fourth Amendment to the United States Constitution guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." The exclusion of evidence obtained in violation of these provisions is essential to the Fourth Amendment. *See Mapp*

8

*v. Ohio*, 367 U.S. 643, 655–56 (1961); *State v. Lee*, 374 Md. 275, 297–98 (2003).

It is well established that the Fourth Amendment guarantees are not implicated in every interaction between the police and an individual. *See Scott v. State*, 366 Md. 121, 131 (2001). In Maryland, like in many states, courts analyze the applicability of the Fourth Amendment in three tiers of interaction between a citizen and the police. *See, e.g., Ferris v. State*, 355 Md. 356, 374 n. 5 (1999).

The most intrusive encounter, an arrest, requires probable cause to believe that a person has committed or is committing a crime. *See Florida v. Royer,* 460 U.S. 491, 499 (1983); *Dunaway v. New York,* 442 U.S. 200, 207 (1979).

The second category, commonly known as a *Terry* stop, is less intrusive than a formal custodial arrest and must be supported by reasonable suspicion that a person has committed or is about to commit a crime, which permits an officer to stop and briefly detain an individual. *See Berkemer v. McCarty,* 468 U.S. 420, 439 (1984); *Ferris,* 355 Md. at 384. A police officer may engage in an investigatory detention without violating the Fourth Amendment as long as the officer has a reasonable, articulable suspicion of criminal activity. *See Royer,* 460 U.S. at 498. A *Terry* stop is limited in duration and purpose and can only last as long as it takes a police officer to confirm or to dispel his suspicions. *See Ferris,* 355 Md. at 372–73, 735 A.2d at 499–500; *See also Terry v. Ohio,* 392 U.S. 1 (1968). A person is seized under this category when, in view of all the circumstances surrounding the incident, by means of physical force or show of authority a reasonable person would have believed that he was not free to leave or is compelled to respond to questions. Factors that might indicate a seizure include a threatening presence

of several officers, the display of a weapon by an officer, some physical touching of the person, the use of language or tone of voice indicating that compliance with the officer's request might be compelled, approaching the citizen in a nonpublic place, and blocking the citizen's path. *See Michigan v. Chesternut,* 486 U.S. 567, 575 (1988); *United States v. Mendenhall,* 446 U.S. 544, 554 (1980); *cf. Royer,* 460 U.S. at 502–03.

The least intrusive police-citizen contact, a consensual encounter, involves no restraint of liberty and elicits an individual's voluntary cooperation with non-coercive police contact. *See United States v. Mendenhall*, 446 U.S. 544, 553 (1980); *United States v. Werking*, 915 F.2d 1404, 2408 (10th Cir. 1990). A consensual encounter does not require any suspicion by the police, and because an individual is free to leave at any time during the encounter, the Fourth Amendment is not implicated. As such, an individual is not considered to have been "seized" within the meaning of the Fourth Amendment. *See Ferris*, 355 Md. at 373–74 n. 4.

Encounters are consensual in situations where the police approach a person in a public space, request information voluntarily, and the person is free to walk away without being required to answer. *See, e.g., Mendenhall*, 445 U.S. at 543–44. The Fourth Amendment guarantees are not implicated in such encounters unless the police use either physical force or a show of authority to restrain the person's liberty so that a reasonable person would not feel free to decline the officer's requests or walk away from the encounter. *Id.* at 554; *see also Terry v. Ohio*, 392 U.S. 1 (1968). In *Ferris*, the Maryland Court of Appeals described a consensual encounter

as simply the voluntary cooperation of a private citizen in response to non-

10

coercive questioning by a law enforcement officer. Because an individual is free to leave at any time during such an encounter, he is not "seized" within the meaning of the Fourth Amendment.

355 Md. at 373 n. 4 (citations omitted).

The Supreme Court has made clear that law enforcement officers do not violate the Fourth Amendment by merely approaching an individual in a public place or asking if he or she is willing to answer questions. *See Florida v. Royer*, 460 U.S. 491, 497, 506 (1983). As such, consensual encounters are those where the police simply approach a person in a public place, engage in conversation, request information, and the person is free to walk away without answering. The Supreme Court has also made clear that the request by a law enforcement officer to examine a person's identification or search his or her belongings does not, in and of itself, make an encounter non-consensual. *See INS v. Delgado*, 466 U.S. 210, 216 (1984); *Florida v. Bostick*, 501 U.S. 429, 435 (1991). Fourth Amendment guarantees are implicated, however, when an officer, by physical force or show of authority, restrains a person's liberty so that a reasonable person would not feel free to terminate the encounter or decline the officer's request. *See Mendenhall*, 446 U.S. at 553–54. Under the *Mendenhall* standard, seizure based on a show of authority does not occur unless the subject yields to the authority. *California v. Hodari*, 499 U.S. 621, 626–27 (1991). In determining whether the person has been seized,

> the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would "have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business."

*Bostick*, 501 U.S. at 437 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)).

11

In *Swift v. State*, 393 Md. 139 (2006), Swift was walking down a public street in a high-crime area when a police officer stopped his marked patrol car, exited the vehicle, and asked Swift for permission to speak with him. During the stop, the officer did not activate his emergency equipment or siren and did not draw his weapon, but he did shine his headlights in the direction of Swift. Upon receiving Swift's identification information, the police determined that there was an outstanding warrant out for Swift. The officer then asked Swift if he had any weapons or drugs on him and asked for permission to search Swift. Without orally responding, Swift put both hands on the hood of the officer's patrol car, which the officer viewed as consent. When the officer went to search Swift, Swift pushed off from the hood and fled. After a foot pursuit and upon his ultimate capture, a bag of crack cocaine was found on Swift's person.

Prior to trial, Swift filed a motion to suppress the bag of crack cocaine, arguing that he was illegally seized by the officer prior to the search. Specifically, Swift contended that, based on the totality of the circumstances, a reasonable person in Swift's situation would not have felt free to leave. The circuit court ultimately denied Swift's motion, and Swift appealed. After this Court affirmed the circuit court's ruling, review was granted by the Court of Appeals.

In making its ruling, the Court of Appeals noted factors that are probative in determining whether a reasonable person would feel free to leave, including

> the time and place of the encounter, *the number of officers present and whether they were uniformed*, *whether the police removed the person to a different location or isolated him or her from others*, *whether the person was informed that he or she was free to leave*, whether the police indicated that the person was suspected of a crime, whether the police retained the person's

12

documents, and whether the police exhibited threatening behavior or physical contact that would suggest to a reasonable person that he or she was not free to leave.

393 Md. at 153 (citing *Ferris*, 355 Md. at 377) (emphasis added). If a reasonable person would feel free to leave under the circumstances, however, then there has not been a seizure within the meaning of the Fourth Amendment.

Whether a reasonable person would have felt free to leave police presence is a highly fact-specific inquiry. As the Court of Appeals stated in *Swift*, "[t]he test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." 393 Md. at 156 (quoting *Chesternut*, 486 U.S. at 573). The Court further emphasized that "what constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Id.* Applying these principles, we now consider whether Appellant was seized within the meaning of the Fourth Amendment.

To determine whether Appellant's encounter with MTA officers on the Light Rail Train was a consensual encounter or a seizure, we ask, considering all of the circumstances surrounding the encounter, would the conduct of the officers "have communicated to a reasonable person that he [or she] was not at liberty to ignore the police presence and go about his business." *Chesternut,* 486 U.S. at 569. After a review of all the facts and circumstances of the case *sub judice,* we agree with Appellant.

Although Appellant was not restrained physically by the MTA officers when they entered the Light Rail Train, Corporal Russell's show of authority, as well as the presence

13

of multiple officers outside the train car, implied to a reasonable person that individuals were not free to leave prior to providing proof of a fare ticket. In conducting the fare inspection, Corporal Russell moved about the car in a way that prevented anyone from exiting without first encountering her, effectively trapping all patrons inside the train car. No officer ever stated that individuals were free to leave, and although that factor does not, in and of itself, determine if a seizure occurred, it is a factor that we consider within the totality of the circumstances. *See United States v. Drayton,* 536 U.S. 194, 206–07 (2002); *Mendenhall,* 446 U.S. at 558–59; *Ferris,* 355 Md. at 379–80. In addition, as was probative in *Swift*, the implied requirement that Appellant wait for the results of the warrant check adds weight to the other circumstances suggesting that Appellant was not free to leave.

The fact that Appellant later voluntarily confessed that he did not possess a fare ticket does not weigh in our analysis. While Appellant's actions were voluntary, the display of authority occurred prior to Corporal Russell's encounter with Appellant and continued when the officers began their query regarding outstanding warrants for Appellant. Appellant's submission to the officers' show of authority is evidenced by his cooperation in the entire process, including him approaching Corporal Russell and waiting while the officers searched for any arrest warrants out against him.

Based upon the evidence presented at the hearing, we conclude that Appellant was seized within the meaning of the Fourth Amendment.[4] If a fare inspector had approached

---

[4] Because we hold that Appellant was individually seized, we do not reach the question of whether this was a "checkpoint." *See Johnson v. State*, No. 1386, Sept. Term

14

Appellant while the train was in motion and asked him to produce proof of payment, and

Appellant could not, the fare inspector could have issued him a citation without implicating

the Fourth Amendment. Thereafter, she could have held him and looked for outstanding

warrants. In this hypothetical scenario, it is the nature of train travel itself and not the MTA

officer that restrained Appellant's freedom of movement. Once the train arrived at the

station, however, and the train ceased travel, it was solely the MTA officers who prevented

Appellant from leaving. Because a reasonable person would have believed that he was not

---

2017 (Aug. — , 2019) (evaluating whether a traffic initiative constituted a "checkpoint" for the purposes of the Fourth Amendment). In *Johnson*, Johnson was stopped by the Baltimore Police Department during a traffic initiative in which an officer spotted Johnson driving without wearing a seat belt. As a result of that stop, the police discovered an open warrant for Johnson's arrest, as well as a handgun under the driver's seat of the vehicle. Johnson appealed his later convictions, asking this court to review whether the traffic initiative was an illegal checkpoint. Affirming the trial court, we held that it was not.

In making our ruling, we noted that traffic checkpoint programs that have been found lawful under the Fourth Amendment are "designed primarily to serve purposes closely related to the problems of policing the border or the necessity of ensuring roadway safety. *Johnson*, slip op. at 9-10 (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 41 (2000)). However, "when the primary purpose of a checkpoint program 'is to uncover evidence of ordinary criminal wrongdoing, the program contravenes the Fourth Amendment.'" *Id.* at 10. Furthermore, *Johnson* noted numerous checkpoint cases noting how constitutional checkpoints typically provide notice of the checkpoint as well as the ability for motorists to avoid such checkpoints by U-turning.

In this case, however, there is no assertion by the State that the fare inspection was being conducted to police the border or ensure roadway safety. In fact, officers testified that fare inspections are used as a vehicle to conduct outstanding warrant searches. As the primary purpose was to "uncover evidence of ordinary criminal wrongdoing," we find that the program contravenes the Fourth Amendment. Additionally, unlike the checkpoint cases cited in *Johnson*, notice of the inspection was not given until officers boarded the train car. Every passenger was required to provide proof of fare at a moment's notice. As such, this case is clearly distinguishable from checkpoint cases like that of *Johnson*, and our analysis never reaches the weighing of the public convenience against the law enforcement necessity that is the hallmark of checkpoint jurisprudence. *See, e.g., Edmond*, 531 U.S. at 47 (holding that in checkpoint cases, constitutionality "depends on a balancing of the competing interests at stake and the effectiveness of the program").

free to leave under such circumstances, we hold that Appellant was seized within the meaning of the Fourth Amendment.

While there have been a few limited circumstances where suspicionless searches have been upheld, such as "special needs, beyond the normal need for law enforcement," such circumstances do not exist here. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). Furthermore, a warrantless seizure may not violate the Fourth Amendment if the seizure falls within one of only a few well-defined exceptions to the warrant requirement. Warrantless seizures are acceptable based on the following three exceptions: (1) *Terry* stops, or investigatory detentions of persons based on reasonable suspicion that a person has committed or is about to commit a crime, *Ferris*, 355 Md. at 284; (2) arrests that occur in public or are based on probable cause to believe that a person has committed or is about to commit a crime, *Royer*, 460 U.S. at 498; and (3) special needs seizures that are motivated by a primary purpose other than basic law enforcement. *Riley v. California*, 134 S. Ct. 2473 (2014). In this case, however, there is no indication that MTA officers had any belief that anyone on board the Light Rail, in particular the Appellant, had or was about to commit a crime when the officers began the fare inspection. Additionally, the State has not raised any argument that the fare inspection was being conducted for anything more than a basic law enforcement purpose. As such, the warrantless seizure of Appellant does not fall within any of the three exceptions to the warrant requirement.

We note that the individual components of this encounter, considered in isolation, may not be indicative of a seizure. The Fourth Amendment does not prevent an officer from approaching an individual and asking if they have a Light Rail Train fare ticket. An

16

officer may ask a person for identification. And simply conducting a warrants check does not create a seizure. But we must heed the clear direction of the Supreme Court, "that any assessment as to whether police conduct amounts to a seizure implicating the Fourth Amendment must take into account all of the circumstances surrounding the incident in each individual case." *Chesternut,* 486 U.S. at 572 (citations and internal quotations omitted). Under the circumstances presented here, we conclude that Appellant was seized the moment the MTA officers entered the Light Rail Train. As such, the voluntary admission by Appellant afterward is seen by this Court as Appellant clearly yielding to the officers' show of authority.

## *Implied Consent*

The State argues in its brief that fare inspections are voluntary under the principle of implied consent. The State cites *Florida v. Jardines*, 569 U.S. 1 (2013) and *Farkas v. Williams*, 823 F.3d 1212 (9th Cir. 2016) to support its argument that each passenger provides implied consent "to the limited intrusion of showing proof of fare payment on demand" when traveling on the Light Rail Train. However, both *Jardines* and *Farkas* are distinguishable from the case at bar.

The State argues that *Jardines* holds that there is an "implicit license" for visitors, including police officers, to "approach [a] home by the front path, knock promptly, wait briefly to be received, and then leave." *Jardines*, 569 U.S. at 8. As such, the State contends that officers also have an implicit license to approach Light Rail patrons to see if they have a ticket. However, *Jardines* also holds that while the police are allowed to voluntarily approach and converse with individuals, including at their front door, they are barred from

17

illegally searching or seizing someone without probable cause. In this case, Corporal Russell did not board the Light Rail Train as just another patron; had she done so, any conversation she later had with Appellant would be deemed a consensual encounter. Instead, she was actively seeking out individuals who failed to purchase a fare ticket. To cut the State's argument even further, Corporal Russell showed her authority, as was discussed *supra*. As such, *Jardines* provides no relief for Corporal Russell's actions.

In *Farkas*, the Ninth Circuit ruled that individuals impliedly consent to being searched upon entering a military base. However, the Court there placed emphasis on the very specific security aspects of the military base. *Farkas*, 823 F.3d at 1216 ("[T]he typical trappings of a military base . . . 'combine to puncture any reasonable expectations of privacy for a citizen' who voluntarily enters.") (citing *Morgan v. United States*, 323 F.3d 776 (2003)). As the Court reasoned in *Farkas*, individuals entering a "restricted-access" base, past gate-guarded entry points, signs stating that all visitors are subject to search, and military personnel patrols impliedly consent to being searched. *Id.* By contrast, Light Rail Trains do not have such barbed-wire fencing or armed guards at their entrance, nor do their security reflect national defense concerns. As such, it cannot be assumed that individuals entering the trains have consented to searches like those individuals who enter military bases. For these reasons, *Farkas* is inapplicable.

We refuse to stretch the doctrine of implied consent to apply in cases such as this, where there is an otherwise unlawful, suspicionless seizure. Under the Transportation Article of the Maryland Code, specifically § 7-705, it is illegal to "[f]ail to pay the applicable fare charged by the [MTA] in the required manner" when traveling on an MTA

18

transit vehicle to obtain transit service. As the State expresses in its brief, reasonable patrons of the Light Rail understand that they may be required to show proof of payment upon request by MTA officials. However, reasonable patrons might not understand that by simply traveling on the Light Rail, they may be subject to suspicionless seizures resulting in warrant checks.

The guarantees of the Fourth Amendment must still be respected in regard to the enforcement of § 7-705. Specifically, MTA officers must have reasonable suspicion or probable cause that an individual has or is going to commit a crime before seizing them, absent the encounter being consensual. Here, had an MTA transit worker asked Appellant for proof of fare payment and Appellant failed to provide such proof, the MTA transit worker would have been within their rights to contact MTA officers and tell them of Appellant's wrongdoing. At that point, MTA officers would have had the necessary reasonable suspicion to *Terry* stop Appellant and seek proof of payment. However, in this case the MTA officers lacked reasonable suspicion that *anyone* on the Light Rail Train had broken *any* law, much less § 7-705. As such, MTA officers unlawfully seized Appellant when they conducted their fare inspection.

### ii. The Attenuation Doctrine

In reviewing the second issue at bar in this case, we must first look to *Utah v. Strieff*, 136 S. Ct. 2056 (2016). In that case, a narcotics officer, Officer Fackrell, conducted surveillance on a home based on an anonymous tip about drug activity. *Id.* at 2057. The number of individuals who made brief visits to the home made Officer Fackrell suspicious that the occupants were dealing drugs. *Id.* After observing Edward Strieff leaving the home,

19

Officer Fackrell detained Strieff, identified himself and asked Strieff what he was doing at the home. *Id.* After requesting Strieff's identification and relaying that information to dispatch, Officer Fackrell learned that there was an outstanding arrest warrant out for Strieff for a traffic violation. *Id.* Officer Fackrell arrested Strieff, searched him, and found methamphetamine and drug paraphernalia. *Id.* Strieff later moved to suppress the evidence, arguing Officer Fackrell's actions constituted an unlawful investigatory stop. The United States Supreme Court ultimately affirmed the trial court's decision to deny Strieff's motion. *Id.*

In *Strieff*, the United States Supreme Court applied the attenuation doctrine when it evaluated whether a pre-existing arrest warrant sufficiently attenuated "the causal link between the government's unlawful act and the discovery of evidence[.]" 136 S. Ct. at 2061. Specifically, the Court looked at three factors:

> First, we look to the "temporal proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. Second, we consider "the presence of intervening circumstances." Third, and "particularly" significant, we examine "the purpose and flagrancy of the official misconduct."

*Strieff*, 136 S. Ct. at 2062 (citing to *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975) (internal citations omitted)). The Supreme Court reasoned that an outstanding arrest warrant was "a critical intervening circumstance that is wholly independent of the illegal stop" and therefore the illegal stop was "sufficiently attenuated by the pre-existing arrest warrant." 136 S. Ct. at 2063 (internal citation omitted) (internal quotation marks omitted); *see also Myers v. State*, 395 Md. 261, 290 (2006); *Cox v. State*, 397 Md. 200, 209–10 (2007).

20

As the Court stated, "[a] warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions." *United States v. Leon,* 468 U.S. 897, 920, n. 21 (1984) (internal quotation marks omitted).

In its brief here, the State presses the argument that the attenuation doctrine would apply if the seizure of Appellant was found by this Court to be unlawful. Appellant contends that while the outstanding arrest warrant is an intervening circumstance pursuant to *Strieff*, the temporal proximity between Appellant's illegal seizure and the discovery of the arrest warrant, as well as the alleged "flagrant misconduct" committed by Corporal Russell, prevent application of the attenuation doctrine in this case.

The application of the attenuation doctrine is a fact-specific analysis that focuses on when and the manner in which the evidence seized was obtained in relation to the unlawful conduct. Where there is an outstanding arrest warrant, the attenuation doctrine may apply when the discovery of the warrant breaks the causal chain from any possible taint to the evidence collected. *See generally Strieff*, 136 S. Ct. at 2062.

a. *Temporal Proximity*

Appellant first places focus on the closeness of the timing of the discovery of his gun in relation to his unlawful seizure by MTA officers. He argues that because the two events happened in close proximity to each other, the warrant could not attenuate the taint of the alleged unlawful stop.

We have previously held that "the question of timing is not dispositive on the issue of taint, *especially* because there was an outstanding arrest warrant between the initial stop and the subsequent search incident to arrest, even though some of the evidence was

21

discovered shortly after the illegal stop." *Myers*, 395 Md. at 292 (emphasis added). Here, the "temporal proximity" between Appellant's alleged unlawful seizure and the discovery of the gun favors suppression of the evidence; however, this factor is outweighed if there exists an intervening circumstance and an absence of flagrant police misconduct. *See e.g. Cox v. State*, 397 Md. 200, 218 (2007) (holding that a two minute time lapse weighed in the defendant's favor but recognizing that, "[t]he temporal proximity factor must depend ... on other factors to which it relates, because a 'lengthy detention can be used to exploit an illegal arrest at least as easily as a brief detention.'" (quoting *Ferguson v. State*, 301 Md. 542, 550 (1984)).

b. *Flagrant Police Misconduct*

Appellant argues that the testimony provided by Corporal Russell and Officer Tobin is evidence of the officers' "flagrant misconduct" in utilizing fare inspections to search for possible outstanding warrants for patrons who have otherwise given no indication that they have committed a crime.

In regard to the "purpose and flagrancy of the official misconduct," the *Strieff* court found this factor "especially significant." 136 S. Ct. at 2063. There, the Court looked at whether the unlawful stop was part of any systematic or recurrent police misconduct, or whether the stop was an isolated instance of negligence. *Id.* The Court noted that "errors in judgment hardly rise to a purposeful or flagrant violation . . . of Fourth Amendment rights," and the Court should value an officer's otherwise lawful conduct after engaging in an unlawful stop. *Id.* Specifically, the Court stated:

22

Officer Fackrell was at most negligent. In stopping Strieff, Officer Fackrell made two good-faith mistakes. First, he had not observed what time Strieff entered the suspected drug house, so he did not know how long Strieff had been there. Officer Fackrell thus lacked a sufficient basis to conclude that Strieff was a short-term visitor who may have been consummating a drug transaction. Second, because he lacked confirmation that Strieff was a short-term visitor, Officer Fackrell should have asked Strieff whether he would speak with him, instead of demanding that Strieff do so. Officer Fackrell's stated purpose was to "find out what was going on [in] the house." . . . Nothing prevented him from approaching Strieff simply to ask. See *Florida v. Bostick,* 501 U.S. 429, 434 (1991) ("[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions"). But these errors in judgment hardly rise to a purposeful or flagrant violation of Strieff's Fourth Amendment rights.

*Id.*

This factor reflects the underlying rationale of the exclusionary rule "by favoring exclusion only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant." *Id*. As such, when officers blatantly disregard an individual's rights, exclusion might be necessary to deter that kind of misconduct, regardless of subsequent events that interrupted the chain of causation. *See Holt v. State*, 435 Md. at 471 (Greene, J., dissenting) (reasoning that "[t]o ignore the third attenuation factor" by finding attenuation solely based on the commission of a new crime "would be to ignore the very purpose underlying the exclusionary rule").

In *Strieff*, Justice Clarence Thomas noted that there was no indication that Officer Fackrell's "unlawful stop was part of any systematic or recurrent police misconduct." 136 S. Ct. at 2063. Instead, Justice Thomas stated that all of the evidence suggested that the stop was an "isolated instance of negligence that occurred in connection with a bona fide

23

investigation of a suspected drug house." *Id.* As such, Justice Thomas ultimately concluded that Officer Fackrell's conduct was at-most negligence, not purposeful or flagrant.

Here, however, evidence suggests that the conduct of the MTA officers was not merely negligent. Appellant argues that fare inspections are tools utilized by MTA officers to engage in unlawful "fishing expeditions," specifically citing to Corporal Russell's statement that "the purpose of the fare inspection is to see if someone has committed a crime by riding the train without paying" and Corporal Russell's affirmation to being asked if fare inspections are "an apparatus to be able to check people for warrants." We agree.

However, the trial court failed to consider whether the misconduct committed by Corporal Russell in illegally seizing Appellant constituted "flagrant misconduct" instead of a good-faith effort to comply with the law. Instead, the trial court simply concluded:

> Even assuming, arguendo, Corporal Russell engaged in an unlawful investigatory stop on the light rail car, the discovery of a valid, pre-existing arrest warrant attenuated the connection between the unlawful stop and the evidence seized from the Defendant incident to arrest.

Because Appellant was illegally seized by Corporal Russell, the fruits of his subsequent search must be suppressed absent the application of the attenuation doctrine.[5]

---

[5] In a recent law journal article, the student author noted that administrative problems unrelated to crime have led to backlogs of unserved warrants and as a result, certain jurisdictions have a high ratio of warrants to population. Allison Bruff, *Ripe for Rejection: A Methodology for States' Departure from Utah v. Strieff and its Poisonous Fruit*, 86 Miss. L.J. 833 (2017). The author surmises that in such jurisdictions (as opposed to jurisdictions with lower ratios), law enforcement will be more willing to engage in unconstitutional searches and seizures because of the relatively safe bet that they will subsequently find an outstanding warrant to attenuate the taint of the prior unconstitutional behavior. If true, this is of great concern as it undermines the entire "fruit of the poisonous tree" doctrine, whose purpose is to reduce the incentives toward unconstitutional law enforcement behavior.

24

As we previously stated, the taint of the illegal seizure will only be attenuated if the sum of the three *Strieff* factors weighs against suppression. In this case, the intervening circumstance of discovering Appellant's outstanding arrest warrant weighs against suppression. However, the temporal proximity of the MTA officers' search of Appellant weighs in favor of suppression. Likewise, the flagrant use of fare inspections by MTA officers to conduct warrant searches leads this Court to conclude that the attenuation doctrine is not applicable, and the fruits of the MTA officers' search should have been suppressed. As Officer Russell affirmed, fare inspections are utilized by MTA officers as "an apparatus to be able to check people for warrants." Simply put, MTA officers cannot systematically use fare inspections as a means of determining if Light Rail passengers have outstanding warrants. To allow such misconduct would be a grave injustice and greatly hinder the protections afforded by the Fourth Amendment.

Accordingly, we hold that the Circuit Court for Baltimore City should have granted Appellant's Motion to Suppress, pursuant to the facts in this case, where there was no evidence establishing that warning signs were posted on the day of the appellant's arrest and Corporal Russell's testimony that the fare inspections are used to check for warrants. In keeping with *Edmonds*, due to the officers utilizing the MTA fare inspections to check for criminal wrongdoing, under these facts, the behavior was flagrant, contravening the Fourth Amendment. Because the evidence in question was a vital component of the State's case against Appellant and was necessary to subsequently convict Appellant, we reverse Appellant's convictions.

25

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED; COSTS TO BE DIVIDED EVENLY BETWEEN THE PARTIES.**

The correction notice for this opinion can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/0478s18cn.pdf