*State of Maryland v. Kennard Carter*, No. 74, September Term, 2019.
Opinion by Biran, J.

**CONSTITUTIONAL LAW – FOURTH AMENDMENT – SEIZURE –** The Court of Appeals held that a Maryland Transit Authority ("MTA") police officer seized Respondent within the meaning of the Fourth Amendment when the officer announced a fare sweep aboard a Baltimore Light Rail train after it arrived at a station. A reasonable passenger would not have felt free to leave the train without first displaying proof of fare payment, or the lack thereof, to the officer.

**CONSTITUTIONAL LAW – FOURTH AMENDMENT – IMPLIED CONSENT –** The Court of Appeals held that Light Rail passengers do not impliedly consent to be seized in a fare sweep. No signs or other notices inform riders that they may be subject to a seizure aboard the train. In addition, the Light Rail differs from military bases, airports, and other facilities where individuals who enter reasonably expect that they may be subject to search and seizure for security reasons.

**CONSTITUTIONAL LAW – FOURTH AMENDMENT – SPECIAL NEEDS DOCTRINE –** The special needs doctrine is a recognized exception to the Fourth Amendment's warrant requirement. Under that doctrine, a program of warrantless searches or seizures undertaken without reasonable suspicion may be constitutional if the primary purpose of the program is to further a governmental interest besides the detection of ordinary criminal wrongdoing. The Court of Appeals held that the record of the suppression hearing was insufficiently developed to determine the primary purpose of a fare sweep and, therefore, whether the special needs doctrine renders MTA's program of fare sweeps constitutional.

**CONSTITUTIONAL LAW – FOURTH AMENDMENT – ATTENUATION –** The Court of Appeals held that, assuming (without deciding that) Respondent's seizure was not constitutional under the special needs doctrine, the discovery of an open warrant for Respondent's arrest did not attenuate the taint of the illegal warrantless seizure. The discovery of a warrant does not attenuate the taint of an unconstitutional seizure conducted under an agency program, where one of the directives of the program requires officers to search for open warrants.

IN THE COURT OF APPEALS

OF MARYLAND

No. 74

September Term, 2019

STATE OF MARYLAND

v.

KENNARD CARTER

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

Opinion by Biran, J.
Watts, J., concurs.

Filed: January 29, 2021

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

Several million passengers ride Baltimore Light Rail ("Light Rail") trains each year. There is no turnstile to pass through before boarding a Light Rail train. Nor does anyone check passengers for proof of fare payment before they get on a train. Thus, it is possible for a person to board a Light Rail train without paying the required fare. However, Maryland Transit Administration ("MTA") police officers routinely check whether passengers on Light Rail trains who are required to pay the fare have done so. One of the methods that MTA police officers have used to make this determination is a "fare sweep." In a fare sweep, after a train has arrived at a station, MTA officers simultaneously board each car of the stationary train and announce that all passengers must show their tickets or passes. If a passenger does not produce proof of fare payment, the officer at that point directs the passenger to leave the train and to speak with another officer who is waiting on the platform. Once all non-paying passengers have stepped off the train, the train departs the station. On the platform, officers then obtain identification from the non-paying passengers, conduct warrant checks on those passengers, and issue a $50 citation to each passenger for the criminal offense of fare evasion. If a non-paying passenger is not the subject of an outstanding warrant, the passenger is then free to leave.

On the evening of October 2, 2017, MTA police officers conducted a fare sweep aboard a Light Rail train after the train arrived at the Mount Royal station in Baltimore City. After an officer announced that she was checking all riders for tickets, Respondent Kennard Carter approached the officer and told her that he did not have a ticket. The officer then directed Carter to step off the train. After Carter did so, an officer on the platform obtained identifying information from Carter and ran a warrant check on him, which

revealed the existence of a warrant for Carter's arrest. In the course of attempting to arrest Carter on that warrant, officers saw that Carter had a gun. Carter subsequently was indicted in the Circuit Court for Baltimore City on firearms and other charges.

Carter moved to suppress the gun and other evidence allegedly found by officers after Carter left the Light Rail train, arguing that the fare sweep constituted a seizure without reasonable suspicion to believe that he had evaded payment of the fare. The circuit court denied Carter's suppression motion, finding that the officers did not seize Carter prior to his admission that he lacked a ticket. Alternatively, the circuit court ruled that, if officers unlawfully seized Carter, the discovery of the arrest warrant attenuated the taint of the Fourth Amendment violation. A jury subsequently found Carter guilty of several offenses.

On appeal, Carter renewed his argument that the fare sweep constituted a warrantless seizure not based on reasonable suspicion. Both Carter and the State also addressed for the first time whether the fare sweep was constitutional under the "special needs" doctrine, one of the recognized exceptions to the Fourth Amendment's warrant requirement. The answer to that question turned, as a threshold matter, on whether or not the primary purpose of an MTA fare sweep is to further the State's generalized interest in criminal law enforcement – a point that the circuit court had not considered during the suppression hearing. The State also argued on appeal that Carter impliedly consented to a seizure necessary to determine whether he had paid his fare. Finally, the State renewed its argument that the discovery of the warrant for Carter's arrest attenuated the taint of any Fourth Amendment violation.

2

The Court of Special Appeals held that: (1) the fare sweep effected a warrantless seizure of Carter; (2) Carter did not impliedly consent to the seizure; (3) the seizure was not constitutional under the special needs doctrine; and (4) the discovery of the warrant did not attenuate the taint of the unlawful seizure. Thus, the Court of Special Appeals concluded that the circuit court should have granted Carter's suppression motion, and the court reversed Carter's convictions.

We largely agree with the Court of Special Appeals' resolution of the parties' contentions. However, we disagree with the intermediate appellate court that the record is sufficiently developed to assess whether or not the special needs doctrine renders Light Rail fare sweeps constitutional. Nevertheless, because it was the State's burden to establish the constitutionality of Carter's seizure at the suppression hearing in this case and the State failed to do so, we will affirm the judgment of the Court of Special Appeals.

## I

### Background

**A. The Light Rail**

MTA operates the Light Rail, an above-ground modern streetcar-like train system transporting passengers in the city of Baltimore and surrounding counties.[1] The Light Rail

---

[1] The Light Rail system was renamed the "Light RailLink" in 2017. It formerly was called the "Baltimore Light Rail." In this opinion, we refer to the system as it is still commonly known in the Baltimore metropolitan area, which is simply the "Light Rail."

services over seven million passenger trips annually.[2] As the Light Rail neared completion in 1991, the Maryland Department of Transportation ("MDOT") advocated that the General Assembly make the Light Rail a "barrier-free" mass transit system, explaining that barrier-free systems can cost 20-30 times less than systems that contain barriers to entry. *See* Md. Dept. of Transp., Office of the Sec'y, MDOT Written Testimony to Sen. Jud. Proc. Cmte. (Mar. 19, 1991), 1991 HB 716 Bill File, H.B. 716, 405th Sess. (Md. 1991). In a barrier-free rail system, passengers purchase their fares in advance of boarding the train, and do not pass through a ticket checkpoint or a barrier verifying payment prior to boarding. The General Assembly adopted MDOT's recommendation that the Light Rail operate as a barrier-free system, and made it a misdemeanor for a passenger to fail to "pay the applicable fare" or fail to "[e]xhibit proof of payment." *See* 1991 Md. Laws, ch. 222. A police officer or an authorized agent of MTA may issue a citation to a passenger who fails to show proof of payment of the applicable fare upon request. Md. Code, Transp. § 7-704.1(d)(1) (2020 Repl. Vol.). Passengers may purchase Light Rail tickets or passes using ticket vending machines located at each station, as well as at MTA's retail locations or on MTA's website.

---

[2] *See* MTA Media Guide at 9 (2019), available at https://s3.amazonaws.com/mta-website-staging/mta-website-staging/files/Brochures/Media_Guide_2019_WEB.pdf (last accessed on Nov. 24, 2020), archived at https://perma.cc/EH46-LTMZ.

**B. Carter's Prosecution**

1. <u>The Fare Sweep and Carter's Arrest</u>

On Monday, October 2, 2017 at approximately 8:05 p.m., Corporal Latoya Russell and Officer Zachary Tobin, along with other MTA police officers, were waiting on the platform of the Mount Royal Light Rail station in Baltimore City to conduct a fare sweep of the next Light Rail train to arrive at that station.[3] Carter was a passenger on that train.

The train pulled in shortly before 8:06 p.m. Within seconds of the train's arrival, Corporal Russell and other officers boarded the two train cars. Officer Tobin and other officers remained on the platform. Once on the train, Corporal Russell announced the fare sweep, informing all passengers that she was checking tickets and advising them to have their tickets out.

In response to Corporal Russell's announcement, Carter approached Corporal Russell and told her that he did not have a ticket. At Corporal Russell's direction, Carter stepped off the train and reported to officers on the platform at approximately 8:07:23 p.m. The train left the station at 8:07:30 p.m. Officer Tobin instructed Carter to sit on a bench on the platform and asked him for identification. Carter was unable to provide identification, but gave Officer Tobin his name, date of birth, and social security number. A check of that information revealed an open warrant for Carter's arrest.

---

[3] The events that occurred on and near the platform at the Mount Royal Light Rail station on October 2, 2017, and the times at which they happened, are visible on a video recording made by a camera situated above the platform.

Based on the result of the warrant check, Officer Tobin began to place Carter in handcuffs. Carter resisted Officer Tobin's attempt to handcuff him and tried to flee. Carter then struggled on the platform with Officer Tobin and other officers. During the struggle, Officer Tobin saw that Carter had a handgun in his waistband. Carter attempted to retrieve the gun, which fell onto the train track during the struggle. After Officer Tobin was able to subdue Carter, the officers recovered the gun from the tracks and then searched Carter incident to his arrest, allegedly discovering cocaine on Carter's person.

2. The Suppression Hearing and Trial

Carter was indicted in the Circuit Court for Baltimore City on five counts: (1) possession of a firearm after having been convicted of a crime of violence; (2) possession of a firearm after having been convicted of a disqualifying crime; (3) wearing, carrying, and transporting a handgun on his person; (4) possession of cocaine; and (5) resisting arrest.

After Carter moved to suppress the gun and drugs that the officers allegedly discovered in the course of arresting him, the circuit court held a suppression hearing. As part of its evidentiary presentation, the State played the video recording that showed the officers boarding the train to conduct the fare sweep, as well as the aftermath of the fare sweep. Corporal Russell and Officer Tobin also testified at the hearing.

Both Corporal Russell and Officer Tobin explained that MTA officers routinely conduct fare sweeps such as the one that led to Carter's arrest. According to Corporal

Russell, MTA officers perform such fare sweeps approximately six times per week, and they are a "standardized process." Officer Tobin described the fare sweep as follows:

> [S]ome officers board the train. Some officers stay on the platform awaiting officers as they pull patrons off of the train that have not paid fare.
>
> ….
>
> [W]hen we board the train, we announce that we are conducting a fare inspection and we promptly ask everybody to show us their passes. Those who do not show passes are required to alight the train and seek an officer on the platform.

On cross-examination, defense counsel asked Officer Tobin: "The purpose of you checking for fare cards is to see if people paid, correct?" Officer Tobin responded, "Correct."

Corporal Russell testified that, after announcing a fare sweep, "you check each patron for tickets." She also explained that running a warrant check is a "part of the process" after a non-paying passenger leaves the train,[4] as is issuing a $50 citation to the fare evader. In response to leading questions from defense counsel, Corporal Russell agreed that the purpose of the fare sweep was to "see if someone has committed a crime by riding the train without paying," and that a fare sweep entails "an investigation to determine if someone broke the law as set by MTA." Corporal Russell also agreed with defense counsel's characterization that "the fare checking also works as an apparatus to be able to check people for warrants as well."

---

[4] Officer Tobin also described warrant checks of non-paying passengers as "routine."

After the officers testified, Carter's attorney argued that Corporal Russell effected a *Terry* stop[5] of Carter without reasonable suspicion to believe that he had evaded payment of the fare. Thus, defense counsel contended, Carter's admission that he did not have a ticket was the fruit of an illegal stop, and the court should suppress all evidence that flowed from the *Terry* stop.

The prosecutor argued that Corporal Russell did not restrain Carter's "liberty of movement" when she announced the fare sweep and directed all passengers to show their tickets. Thus, according to the prosecutor, Corporal Russell did not seize Carter prior to his telling her that he lacked a ticket. Once Carter admitted that he had evaded the fare, the prosecutor contended, Corporal Russell had probable cause (or at least reasonable suspicion) to detain Carter. Alternatively, the prosecutor argued that, if Corporal Russell seized Carter without reasonable suspicion, the discovery of an open arrest warrant attenuated the taint from the illegal seizure. The State did not alternatively contend that, if the fare sweep constituted a seizure, it was permissible under the special needs doctrine.

The circuit court denied Carter's suppression motion. The court first ruled that Corporal Russell "engaged in a mere accosting by announcing a fare inspection, and therefore the inquiry did not require Fourth Amendment justification." The court stated that "the fare inspection, albeit investigatory, was not concentrated on [Carter] personally, nor was [Carter] threatened or physically touched by the MTA police officers in any way" prior to his admission to Corporal Russell that he did not have a ticket. Once Carter made

_____

[5] *See Terry v. Ohio*, 392 U.S. 1 (1968).

that admission, the circuit court reasoned, the officers had probable cause to believe that Carter had committed the offense of fare evasion, and therefore they were permitted to detain him to give him a citation as well as to conduct the routine warrant check that led to Carter's arrest and the discovery of the evidence Carter sought to suppress.

Alternatively, the court ruled that, if Corporal Russell seized Carter at the outset, the discovery of the arrest warrant attenuated the taint of the unlawful stop. The circuit court did not consider or decide whether the fare sweep was constitutional under the special needs doctrine.

Carter's jury trial began on March 22, 2018. At the close of the case, the circuit court entered judgments of acquittal as to Counts 2 and 4.[6] The jury found Carter guilty on Counts 1, 3, and 5, which charged Carter with two firearms offenses and resisting arrest, respectively. The circuit court sentenced Carter to 10 years' imprisonment on Count 1 (possession of a firearm after having been convicted of a crime of violence), suspending all but a mandatory minimum five-year term without the possibility of parole. The court imposed concurrent three-year terms on the other two counts of conviction, along with three years of supervised probation.

---

[6] The State elected not to submit Count 2 – the lesser of the two firearm possession counts – to the jury, thus leading the trial court to enter an acquittal on that count. As for Count 4, which charged Carter with possession of cocaine, the State failed to establish a chain of custody with respect to the cocaine that the officers allegedly discovered while searching Carter incident to his arrest.

9

3. Appeal

Carter appealed his conviction to the Court of Special Appeals. In a reported opinion, the intermediate appellate court concluded that the circuit court should have granted Carter's suppression motion. *Carter v. State*, 243 Md. App. 212 (2019). First, contrary to the State's argument, the court held that Corporal Russell seized Carter when she boarded the stationary train and announced the fare sweep, asking all passengers to have their tickets out for inspection. The court explained that, although the officers did not physically restrain Carter when they boarded the train, Corporal Russell's show of authority, as well as the presence of multiple officers outside the train car, implied to a reasonable person that individuals were not free to leave prior to providing proof of fare payment. *Id.* at 231.

The court then considered and rejected two alternative arguments that the State made to justify the warrantless, suspicionless seizure. First, the State argued that the fare sweep was constitutional under the special needs doctrine. In their briefs to the Court of Special Appeals, the parties discussed a leading Supreme Court case on the special needs doctrine, *City of Indianapolis v. Edmond*, 531 U.S. 32, 41-42 (2000), which held that the warrantless highway checkpoints at issue in that case were unconstitutional because their primary purpose was to uncover evidence of ordinary criminal wrongdoing. The State distinguished MTA fare sweeps from the highway checkpoints at issue in *Edmond* and argued that, if the officers seized Carter, the seizure was permissible under the special needs doctrine. Carter disagreed, arguing that the primary purpose of MTA fare sweeps "is to

ferret out possible criminal wrongdoing," thereby rendering the special needs exception inapplicable.

The Court of Special Appeals agreed with Carter that the special needs doctrine did not save MTA's warrantless, suspicionless fare sweep from invalidation under the Fourth Amendment. *Carter*, 243 Md. App. at 232-34 & n.4. Although the court recognized that the Supreme Court has upheld suspicionless searches and seizures where they have furthered "special needs, beyond the normal need for law enforcement," *id.* at 233 (quoting *Edmond*, 531 U.S. at 37), the intermediate appellate court accepted Carter's contention that the primary purpose of a fare sweep is "to uncover evidence of ordinary criminal wrongdoing." *Id.* at 233 n.4 (internal quotation marks omitted). The court based this factual finding on Corporal Russell's testimony on cross-examination in which she agreed with defense counsel's suggestion that fare sweeps are used as a vehicle to conduct outstanding warrant searches. *See id.*

Next, the State argued that Carter impliedly consented to a seizure so that officers could check whether he had paid the fare to board the Light Rail train. *Id.* at 234-36. The Court of Special Appeals disagreed, distinguishing cases such as *Farkas v. Williams*, 823 F.3d 1212 (9th Cir. 2016), in which the federal appellate court held that individuals impliedly consent to being searched upon entering a military base:

> As the Court reasoned in *Farkas*, individuals entering a "restricted-access" base, past gate-guarded entry points, signs stating that all visitors are subject to search, and military personnel patrols impliedly consent to being searched…. By contrast, Light Rail Trains do not have such barbed-wire fencing or armed guards at their entrance, nor do their security reflect national defense concerns. As such, it cannot be assumed that individuals

11

entering the trains have consented to searches like those individuals who enter military bases….

As the State expresses in its brief, reasonable patrons of the Light Rail understand that they may be required to show proof of payment upon request by MTA officials. However, reasonable patrons might not understand that by simply traveling on the Light Rail, they may be subject to suspicionless seizures resulting in warrant checks.

*Carter*, 243 Md. App. at 235-36.

Finally, the Court of Special Appeals held that the subsequent discovery of the open warrant for Carter's arrest did not attenuate the taint of the unlawful seizure. *Id.* at 236-41. In reaching this conclusion, the court applied the three factors set forth in *Brown v. Illinois*, 422 U.S. 590 (1975). The court observed that the first two factors – the "temporal proximity" between the unlawful seizure of Carter and the seizure of the evidence, and the "intervening circumstance" of the discovery of the open warrant – essentially canceled each other out. *See Carter*, 243 Md. App. at 238-39. As to the third and "especially significant" factor, the flagrancy of the police misconduct, the Court of Special Appeals again relied on Corporal Russell's testimony that "the purpose of the fare inspection is to see if someone has committed a crime by riding the train without paying" and her "affirmation to being asked if fare inspections are 'an apparatus to be able to check people for warrants.'" *Id.* at 240-41. The court opined that "MTA officers cannot systematically use fare inspections as a means of determining if Light Rail passengers have outstanding warrants. To allow such misconduct would be a grave injustice and greatly hinder the protections afforded by the Fourth Amendment." *Id.* at 242.

Having concluded that the officers unlawfully seized Carter and that the subsequent discovery of the open warrant for Carter's arrest did not attenuate the taint of the constitutional violation, the Court of Special Appeals held that the circuit court should have granted Carter's suppression motion. *Id.* Because the suppressed evidence "was a vital component of the State's case against [Carter] and was necessary to subsequently convict [him]," the court reversed Carter's convictions. *Id.*

On January 30, 2020, the State filed a petition for a writ of *certiorari.* On March 11, 2020, we granted the State's petition, 467 Md. 691 (2020), and agreed to review the following questions (which we have paraphrased):

I. Does MTA's practice of conducting fare sweeps on the Light Rail comply with the Fourth Amendment?

II. If the fare sweep that resulted in Carter's seizure violated the Fourth Amendment, did the subsequent discovery of an open warrant for Carter's arrest attenuate the violation, where any unconstitutionality of the MTA's fare inspection practice was not previously established?[7]

---

[7] The State phrased the questions for which it sought review as:

(1) Does [MTA's] practice of fare inspection on the Light Rail comply with the Fourth Amendment?

(2) If fare inspection does not comply with the Fourth Amendment, did the discovery of an open warrant for Carter's arrest nevertheless attenuate the violation under *Utah v. Strieff*, 136 S. Ct. 2056 (2016), where any unconstitutionality of the MTA's fare inspection practice was not previously established?

This case involves a fare "sweep," which we understand to be one specific kind of fare "inspection" that MTA personnel have conducted. Accordingly, we have rephrased the questions presented to refer specifically to fare sweeps.

## II

## Standard of Review

Suppression rulings "present a mixed question of law and fact." *Thornton v. State*, 465 Md. 122, 139 (2019). When this Court reviews a circuit court's denial of a motion to suppress, "ordinarily our review is limited to the evidence presented at the suppression hearing." *Jones v. State*, 407 Md. 33, 44 (2008). We give deference to the trial court's factual findings, upholding them unless they are clearly erroneous. *Id.* at 45. We consider the evidence and all inferences that may be reasonably drawn from the evidence in a light most favorable to the prevailing party on the motion. *Id.* "The ultimate determination of whether there was a constitutional violation, however, is an independent determination that is made by the appellate court alone, applying the law to the facts found in each particular case." *Belote v. State*, 411 Md. 104, 120 (2009) (citations omitted). We evaluate any questions of law *de novo* "without any special deference to the views of the Circuit Court or the Court of Special Appeals." *State v. Thomas*, 465 Md. 288, 301 (2019).

## III

## Discussion

The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. Warrantless searches and seizures are presumptively unreasonable under the Fourth Amendment. *Thornton*, 465 Md. at 141; *Grant v. State*, 449 Md. 1, 16-17 (2016). When police have obtained evidence through a warrantless search or seizure, the State bears the burden to demonstrate that the search or

14

seizure was reasonable, by establishing the applicability of one of the "few specifically established and well-delineated exceptions" to the warrant requirement. *Id.* at 16 (citing *Katz v. United States*, 389 U.S. 347, 356-57 (1967)).

Evidence obtained in violation of the Fourth Amendment will ordinarily be inadmissible under the exclusionary rule. *Thornton*, 465 Md. at 140; *Bailey v. State*, 412 Md. 349, 363 (2010). However, the "significant costs" of the exclusionary rule "have led [the Supreme Court] to deem it applicable only ... where its deterrence benefits outweigh its substantial social costs." *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (cleaned up). Thus, the Supreme Court has recognized several exceptions to the exclusionary rule, including the attenuation doctrine. *See id.* The attenuation doctrine provides that, in some instances, an intervening event – such as the discovery of a warrant for a person's arrest – will sufficiently attenuate the taint of an initially unlawful search or seizure to allow for the admission of evidence discovered subsequent to the intervening event. *See id.*

A. **Constitutionality of Fare Sweeps on Light Rail Trains**

1. The Announcement of the Fare Sweep Effected a Seizure of Carter.

An encounter between an individual and a law enforcement officer implicates Fourth Amendment protections when the officer, by physical force or show of authority, restrains a person's movement, such that a reasonable person would not feel free to walk away from the officer or disregard the officer's questions. *See United States v. Mendenhall*, 446 U.S. 544, 553-54 (1980). Whether an encounter is a seizure implicating the protections of the Fourth Amendment is a fact-specific inquiry based on the totality of the circumstances in a given case. *See Swift v. State*, 393 Md. 139, 150-53, 156 (2006).

15

In the Court of Special Appeals, the State defended the circuit court's ruling that Corporal Russell did not seize Carter. In support of this position, the State argued that "[n]o record evidence indicated that a patron could not simply elect to leave a Light Rail train at the time a [fare sweep] is announced, provided that the patron does so before his or her individual fare is checked." The Court of Special Appeals rejected the State's argument, concluding that, "[a]though [Carter] was not restrained physically by the MTA officers when they entered the Light Rail Train, Corporal Russell's show of authority, as well as the presence of multiple officers outside the train car, implied to a reasonable person that individuals were not free to leave prior to providing proof of a fare ticket." *Carter*, 243 Md. App. at 231. The intermediate appellate court also found significant that Corporal Russell did not inform the passengers as part of her announcement of the fare sweep that any passengers who wished to detrain at the Mount Royal station could do so without displaying a ticket or proof of payment. *See id.* For these reasons, the court held that Carter "was seized within the meaning of the Fourth Amendment." *Id.* at 232.

The State now concedes that Corporal Russell seized Carter when she announced the fare sweep, representing to us that, during a fare sweep, "a passenger generally is not free to leave … without showing proof-of-payment." We accept the State's concession that Corporal Russell's announcement of the fare sweep effected a seizure, as it is consistent with the record before the circuit court. Corporal Russell and other officers boarded both cars of the Light Rail train after it arrived at the Mount Royal station, while several other officers waited on the platform. This was a substantial display of law enforcement authority. Moreover, Officer Tobin testified that, in a fare sweep, when officers board a

16

train, they "announce that [they] are conducting a fare inspection and [they] promptly ask everybody to show us their passes. Those who do not show passes are required to alight the train and seek an officer on the platform." Corporal Russell similarly described her announcement of the fare sweep as informing all the passengers on the train car that she was "checking tickets," and "advis[ing] them to have their tickets out." Corporal Russell also testified that, after announcing a fare sweep, "you check each patron for tickets." In short, the record suggests that a reasonable passenger would have believed what the State tells us, in fact, was the case: the passenger was not free to leave the train without first displaying proof of fare payment or the lack thereof.

For these reasons, we conclude that Corporal Russell seized Carter within the meaning of the Fourth Amendment when she announced the fare sweep. She did so without suspicion that Carter had committed any criminal offense, including fare evasion. Thus, unless the State can establish that the fare sweep falls under one of the recognized exceptions to the warrant requirement, Carter's seizure violated the Fourth Amendment, and his subsequent admission that he lacked a ticket was the fruit of an unlawful detention.

2. Implied Consent

The State contends that two of the exceptions to the warrant requirement render Carter's seizure constitutional. We first consider the State's argument that Carter impliedly consented to the seizure by traveling on the barrier-free Light Rail system.

Consent to a search or seizure is a recognized exception to the warrant requirement. *See, e.g.*, *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973); *Jones*, 407 Md. at 51. The State "bears the burden of proving that 'consent was in fact voluntarily given.'" *State v. Wilson*,

17

279 Md. 189, 201 (1977) (quoting *Schneckloth*, 412 U.S. at 248-49); *Jones*, 407 Md. at 51. Most Fourth Amendment consent cases concern express grants of consent. *See*, *e.g.*, *State v. Green*, 375 Md. 595, 620-24 (2003) (analyzing whether driver's express consent to search his car expired before the start of the search); *Wilson*, 279 Md. at 202-03 (considering whether officer obtained defendant's express consent to search through coercion). However, in some circumstances, consent to a search or seizure can be implied from the surrounding circumstances. *See, e.g.*, *Farkas*, 823 F.3d at 1216-17 (holding that civilian who entered naval base gave implied consent to a Fourth Amendment intrusion).[8]

The State claims that Carter impliedly consented to the seizure Corporal Russell effected when she announced the fare sweep. The Court of Special Appeals rejected this contention, *see Carter*, 243 Md. App. at 234-36, as do we.

The State bases its implied consent argument on the fact that the Light Rail is a barrier-free transit system that requires prepayment of the fare, and because signs on Light Rail platforms accordingly state: "Ticket or Pass Required Before Boarding Trains." In addition, the State asserts that the requirement to show proof of payment during a Light Rail fare sweep is a minimal intrusion compared with other searches and seizures to which citizens have been found to impliedly consent in other contexts. For these reasons, the State

---

[8] Implied consent, as we use that term here, is distinguishable from a Fourth Amendment principle that some courts have also referred to as "implied consent," but is more properly understood as "non-verbal" consent. *See, e.g.*, *Chase v. State*, 120 Md. App. 141, 150 (2000) (occupant of house gave non-verbal consent to officers' requested entry by stepping out of the doorway and allowing the officers to enter the house). Unlike the implied consent that we discuss here, non-verbal consent is a person-specific, affirmative manifestation of agreement to an officer's request to conduct a search or seizure.

contends that the reasonable expectation of any Light Rail passenger is that the passenger may be subject to fare inspection on any given trip. By deciding to ride the Light Rail while maintaining this reasonable expectation, the State argues, a passenger impliedly consents to a fare sweep.

As Carter correctly observes, one of the important things that is missing in this case, but was present in the cases upon which the State relies, is express prior notice that a person may be subject to a search or seizure. For example, in *Farkas*, a civilian (Farkas) entered a naval base for an interview with an investigator. *Farkas*, 823 F.3d at 1214. The investigator directed Farkas to place his keys, wallet, and loose change in a lockbox during the interview. *Id*. Farkas subsequently filed a civil rights lawsuit in which he claimed, among other things, that the investigator seized him in violation of the Fourth Amendment when he restrained his freedom of movement by requiring him to hand over his wallet and keys. *Id.* at 1216. The Ninth Circuit affirmed the trial court's grant of summary judgment against Farkas, holding that "Farkas impliedly consented to this limited restraint on his freedom by voluntarily entering the passage-restricted base and agreeing to enter the interview room." *Id.* The court explained:

> [T]he usual Fourth Amendment analysis does not apply because visitors give their implied consent to be searched and seized when entering a military base…. [T]he typical trappings of a military base (e.g., the barbed-wire fence, the security guards at the gate, the sign warning of the possibility of search) combine to puncture any reasonable expectations of privacy for a civilian who voluntarily enters.

> The same trappings … were at play here. The Ventura County naval base is a restricted-access military base. Each point of entry is gate-guarded and dotted with warning signs alerting visitors that access is restricted, all persons and vehicles are subject to search, the base is patrolled by military

working dogs, and violators will be prosecuted. Farkas's assertion that his consent did not extend to the storage of his personal items is belied by the objective circumstances. Farkas passed the warning signs, met the investigator in the parking lot, and agreed to place his belongings into a lockbox before voluntarily entering the interview room. By passing through an internal checkpoint, which the investigator was required to administer, Farkas reaffirmed by his conduct what had been established at the gate: that he impliedly consented to the possibility of a Fourth Amendment intrusion.

*Id.* at 1216-17.

Similarly, in *Dept. of Transp., Motor Vehicle Admin. v. Armacost*, 299 Md. 392 (1984), this Court analyzed a search as to which citizens had notice. *Armacost* concerned, as relevant here, the Fourth Amendment implications of MVA's Vehicle Emissions Inspection Program ("VEIP"). To measure a car's emissions, the testing official was required to insert a probe into the tailpipe of the vehicle while it was idling for approximately two minutes. *Id.* at 406. Respondents in *Armacost* argued that the warrantless inspection of the interior of a vehicle's tailpipe violated the Fourth Amendment. This Court disagreed. Among other reasons for this conclusion, the Court explained that the search of a vehicle tailpipe to test the level of emissions

> would likely be deemed consensual. No Maryland resident is forced to have his vehicle inspected; the penalty for noncompliance is a loss of the right to drive that vehicle. The VEIP does not affect a citizen's right to drive any other vehicle or to seek alternative means of transportation. It is well accepted … that consent to minimal intrusions may be required by the state as a prerequisite to use of regulated means of travel.

*Id.* at 407-08. The point underpinning this analysis was that, because a reasonable owner of a motor vehicle knows that the VEIP requires the insertion of a piece of equipment inside a car's tailpipe, the owner can make an informed decision about whether to bring the car in for inspection, thereby subjecting the vehicle to such a search.

20

Here, there is no signage that explicitly warns passengers they may be subject to a seizure.[9] It is difficult to understand how someone can impliedly consent to a search or seizure without having notice that the search or seizure may occur. Moreover, the Light Rail contains none of the other security trappings of a military base or an airport[10] that, along with signage informing visitors of the possibility of search or seizure, "combine to puncture any reasonable expectation of privacy" for someone who voluntarily enters the secure portion of such a facility. *Farkas*, 823 F.3d at 1216.

The State asserts that a reasonable passenger understands a barrier-free transit system requires onboard fare inspection to ensure a sufficient rate of fare payment, and therefore, impliedly gives consent to fare inspection when the passenger boards the train. Carter agrees that a reasonable Light Rail passenger likely does understand that some form of fare inspection may occur aboard a train. However, it does not follow that a reasonable passenger understands that the passenger will be seized on a stationary train by police officers for as long as it takes to check whether all passengers have paid their fare. Although the fare sweep in this case – which occurred on a weeknight shortly after 8:00 p.m. – took

---

[9] In an Appendix to its Reply Brief, the State included photographs of several signs and notices that, the State tells us, are located in or near Light Rail train cars. Several of these signs state that passengers must show a valid ticket or pass to a fare inspector upon request. These photographs are not part of the record of the suppression hearing. Even if we were to consider the additional signs depicted in these photographs, they would not change our analysis. None of the additional signs gives notice that passengers may be subject to seizure by police officers in a fare sweep.

[10] *See, e.g.*, *United States v. Edwards*, 498 F.2d 496 (2d Cir. 1974) (upholding the constitutionality of requiring airline passengers to submit to preflight searches of their persons and baggage).

only approximately 90 seconds to complete, a fare sweep during peak travel hours presumably could take longer to conduct. Moreover, there is a significant difference between a team of armed officers seizing an entire train of passengers while the train is stopped at a station, and an individual MTA officer or civilian fare inspector asking passengers to show proof of fare payment while a train is traveling between stations. The Court of Special Appeals did not believe that the latter scenario would constitute a seizure. *See Carter*, 243 Md. App. at 232-33 (explaining that "[i]n this hypothetical scenario, it is the nature of train travel itself and not the MTA officer that restrain[s a passenger's] freedom of movement," and contrasting it to the fare sweep that occurred in this case: "Once the train arrived at the station … and the train ceased travel, it was solely the MTA officers who prevented [Carter] from leaving.").

We need not decide in this case whether a fare inspection aboard a moving Light Rail train conducted by an individual MTA police officer or civilian fare inspector,[11] or by a team of police officers and inspectors,[12] constitutes a seizure for purposes of the Fourth

---

[11] The State informs us that MTA civilian fare inspectors also conduct individual fare inspections on Light Rail trains. However, unlike MTA police officers, civilian fare inspectors lack authority to issue citations or make arrests.

[12] Following the Court of Special Appeals' issuance of its opinion in Carter's case, MTA issued a "Training Bulletin" regarding "Enforcement Sweeps on the Light Rail." In this bulletin, dated December 3, 2019, MTA announced that, effective immediately, "all ***stationary*** fare enforcement ***sweeps*** on the light rail system are suspended until further notice." (Emphasis in original.) The bulletin explained that "[f]are enforcement sweeps will only commence while light rail trains are mobile between stations," and that "[l]ight rail trains will not be held for the purpose of a fare inspection sweep at any station." The bulletin also stated that civilian fare inspectors "will be the primary examiner[s] of all payment fares of patrons during sweeps," and that the civilian fare inspectors "will report all fare violators to an MTA Police officer for proper enforcement actions."

22

Amendment. Nor need we decide, assuming a fare inspection aboard a moving Light Rail train is a seizure, whether a reasonable passenger impliedly consents to such a seizure. We conclude only that a reasonable Light Rail passenger does not impliedly consent to the type of fare sweep at issue in this case.[13]

### 3. The Special Needs Doctrine

Next, we consider the State's argument that the MTA fare sweep is constitutional under the "special needs" exception to the Fourth Amendment warrant requirement. Under the special needs doctrine, courts may uphold the constitutionality of a program of seizures without individualized suspicion, where the program is designed to serve "special governmental needs, beyond the normal need for law enforcement." *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 449 (1990) (citation omitted). For example, in *Sitz*, the Supreme Court held that the Michigan State Police's use of warrantless sobriety checkpoints along state roads was constitutional, where the program was designed to "prevent[] accidents caused by drunk drivers." *Id.* at 449 (internal quotation marks and citation omitted); *see also Little v. State*, 300 Md. 485, 506 (1984) (sobriety checkpoint seizure held to be constitutional, despite lack of warrant, in light of the "State's compelling interest in detecting and deterring drunk driving"). Similarly, in *United States v. Martinez-Fuerte*, 428 U.S. 543, 557, 560-62 (1976), the Supreme Court upheld suspicionless seizures

---

[13] The State's argument comparing the level of intrusion of a fare sweep to the level of intrusion in other cases where courts have found implied consent, is fallacious. It does not follow, for example, that because passengers who have notice of the possibility of a bag search at an airport are deemed impliedly to consent to such a search, *see State v. Hanson*, 34 P.3d 1, 5 (Haw. 2001), a Light Rail passenger without notice of a fare sweep impliedly consents to that comparatively less intrusive police action.

23

that occurred at a Border Patrol checkpoint near the U.S.-Mexico border, noting that a requirement of reasonable suspicion "would largely eliminate any deterrent to the conduct of well-disguised smuggling operations." In upholding these types of suspicionless searches and seizures, courts have found significant the presence of safeguards which "assure that the individual's reasonable expectation of privacy is not subject to the discretion of the official in the field." *Delaware v. Prouse*, 440 U.S. 648, 655 (1979) (internal quotation marks and citation omitted). Thus, such suspicionless seizures "must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." *Brown v. Texas*, 443 U.S. 47, 51 (1979).

An assessment of the applicability of the special needs doctrine to a program of warrantless searches or seizures requires a two-step analysis. *See United States v. Fraire*, 575 F.3d 929, 932 (9th Cir. 2009). First, in order for the special needs exception to apply, the "primary purpose" served by the program must be an objective other than the governmental body's "general interest in crime control." *City of Indianapolis v. Edmond*, 531 U.S. at 42. If the primary purpose of the program is to advance the general interest in crime control – in other words, to "uncover evidence of ordinary criminal wrongdoing," *id.* – then the program is presumptively unconstitutional under the Fourth Amendment. *Illinois v. Lidster*, 540 U.S. 419, 426 (2004). However, the fact that prosecutions may result from the implementation of a governmental program of searches or seizures does not necessarily mean that the "primary purpose" of the program is to further the State's general interest in crime control. As noted above, sobriety checkpoints have been upheld under the special needs doctrine, even though such checkpoints result in the prosecution of

24

individuals who are discovered to have driven while impaired. *See, e.g.*, *Sitz*, 496 U.S. at 449; *Little*, 300 Md. at 506. If the State establishes that the program is not "a general crime control device," *Fraire*, 575 F.3d at 932, then the analysis proceeds to the second step.

That second step requires the court to evaluate the program's "reasonableness, [and] hence, its constitutionality, on the basis of the individual circumstances." *Lidster*, 540 U.S. at 426. This requires balancing three factors: (1) the "gravity of the public concerns served by the seizure," (2) the "degree to which the seizure advances the public interest," and (3) the "severity of the interference with individual liberty." *Id.* at 427 (quoting *Brown v. Texas*, 443 U.S. at 51).

At the suppression hearing in this case, the parties disputed whether Corporal Russell seized Carter prior to his admission that he lacked a ticket. The State did not raise the special needs doctrine as an alternative argument if the circuit court were to determine that Corporal Russell seized Carter. In any event, the circuit court concluded that Corporal Russell had not seized Carter and did not undertake any factual or legal analysis concerning the applicability of the special needs doctrine to MTA's fare sweep program. In particular, the circuit court did not make a factual finding as to the primary purpose of a fare sweep. However, in the Court of Special Appeals, the State relied, for the first time, on the special needs doctrine as an alternate ground for affirmance of the denial of Carter's suppression motion.

Contrasting this case with the traffic safety and border cases in which courts have upheld suspicionless governmental seizure programs under the special needs doctrine, the Court of Special Appeals held that the special needs doctrine does not render MTA fare

sweeps constitutional. *Carter*, 243 Md. App. at 232-34 & n.4. To reach this conclusion, the Court of Specials Appeals made a finding concerning the primary purpose of this kind of fare inspection:

> In this case … there is no assertion by the State that the fare inspection was being conducted to police the border or ensure roadway safety. In fact, officers testified that fare inspections are used as a vehicle to conduct outstanding warrant searches. As the primary purpose was to "uncover evidence of ordinary criminal wrongdoing," we find that the program contravenes the Fourth Amendment.

*Id.* at 233 n.4. Having found the fare sweep presumptively unconstitutional under *Edmond*, the intermediate appellate court did not apply the three *Brown v. Texas* factors. *See id.*

The State argues that the Court of Special Appeals erred in determining that the primary purpose of a fare sweep is to detect evidence of ordinary criminal wrongdoing. Rather, according to the State, the primary purpose of a fare sweep is not to further a general crime-control interest, but rather to deter fare evasion on the Light Rail, thereby promoting fare payment. As support for this contention, the State asks us to consider the nature of a barrier-free transit system such as the Light Rail, asserting that such a system depends on fare inspections to sustain itself.

We have no reason to doubt that some form of fare inspection is essential for the successful operation of a barrier-free transit system. However, it does not necessarily follow that the primary purpose of a *fare sweep* – as opposed to fare inspections that do not involve the simultaneous seizure of all passengers on the train and lead to warrant checks on all non-paying passengers – is to promote fare payment. One can imagine different governmental motivations for different types of fare inspections on the Light Rail. Thus,

26

we are not persuaded that the primary purpose of a fare sweep on the Light Rail is to promote fare payment, simply based on the nature of a barrier-free transit system.

The State next points to a Standard Operating Procedure ("SOP") that MTA has publicly issued regarding fare enforcement. *See* MTA SOP 4.58.37, *Fare Enforcement Procedure*, available at https://s3.amazonaws.com/mta-website-staging/mta-website-staging/files/Police/Fare%20Enforcement%20Procedure.pdf (last accessed on Jan. 12, 2021), archived at https://perma.cc/GXR6-JVH7 (the "Fare Inspection SOP"). In particular, the State directs our attention to a provision of the Fare Inspection SOP which says that "[t]he primary responsibility of the officers performing fare enforcement duties will be to deter fare evasion by the riding public." *Id.* at 4.58.37.5. However, the State represented in its reply brief that this Fare Inspection SOP does not apply to a fare sweep, but rather to a different type of fare inspection in which an individual MTA police officer boards a Light Rail train and checks passengers' proof-of-payment while the train is in transit. The State informs us that fare sweeps are governed by other SOPs that MTA has not made public.[14] Nevertheless, the State invites us to conclude from the statement in the Fare Inspection SOP concerning the primary responsibility of "officers performing fare enforcement duties," that the primary purpose of a fare sweep is "to deter fare evasion by the riding public."

We decline the State's invitation. We have no way to determine whether the phrase "fare enforcement duties" in section 4.58.37.5 of the Fare Inspection SOP applies both to

_____

[14] The State did not provide us with the SOPs governing fare sweeps, which the State says are not in a form that is amenable to judicial notice.

the individual fare inspections that are the subject of that document, and to fare sweeps that have their own governing documents we have not reviewed.

In addition, we discern material differences between an individual inspection covered by the Fare Inspection SOP and a fare sweep. First, as noted above, individual officers conduct fare inspections on Light Rail trains while the trains are in transit, whereas teams of officers, until the Court of Special Appeals issued its opinion, conducted fare sweeps while trains are stationary.

Second, in a fare sweep, if a passenger fails to show proof of payment, the officer has no discretion about what to do next. In that instance, the officer tells the passenger to step off the train and see another officer on the platform, at which time an officer will issue a citation for fare evasion to the passenger and run a warrant check. In contrast, when an individual MTA police officer conducts a fare inspection, if a passenger fails to provide proof of payment upon request, the Fare Inspection SOP directs the officer to ask why the passenger does not have proof of payment. *Id.* at 4.58.37.14.2. After the officer makes that inquiry, "[i]f a reasonable explanation is given for not having proof of payment, e.g., the ticket vending machine was not functioning; [the] customer should be directed to alight the train at the next available stop to purchase a ticket. The officer will stand by and verify that a ticket has been purchased." *Id.* at 4.58.37.14.3. If the passenger does not provide a reasonable explanation for lacking proof of payment, the officer can choose between issuing a citation or a written warning to the passenger. *See id.* at 4.58.37.13 & 4.58.37.14.4. In some circumstances, the officer may arrest a non-paying passenger for a fare offense. For example, if the customer refuses to pay the required fare or if the customer

28

refuses or fails to display identification upon request, the officer may arrest the passenger. *Id.* at 4.58.37.15, 4.58.37.15.1 & 4.58.37.15.2. However, the Fare Inspection SOP directs that an officer should issue a citation, give a written warning, or make an arrest only "after all other means have been exhausted to resolve the violation." *Id.* at 4.58.37.13.[15]

These differences between a fare sweep conducted by multiple officers and a fare inspection conducted by an individual officer suggest the possibility (but in no way conclusively demonstrate) that a different primary purpose underlies these methods of fare enforcement.[16]

For his part, Carter contends that the record of the suppression hearing shows that the primary purpose of a fare sweep is to detect ordinary criminal wrongdoing. In support of this assertion, Carter relies on the officers' agreement with defense counsel's leading questions suggesting that the purpose of checking for proof of payment in a fare sweep is

---

[15] The Fare Inspection SOP directs an individual officer to run a warrant check on a non-paying passenger in some circumstances, although it is not clear what those circumstances are. The relevant provision directs an MTA officer to request a warrant check "[i]n either situation described in (c) or (d) above," *id.* at 4.58.37.14.5, but the Fare Inspection SOP does not include any provision delineated as "(c)" or "(d)," and it is not otherwise clear to us what the phrase "either situation" references.

[16] *Amicus curiae* Maryland Criminal Defense Attorneys' Association notes that MTA won a national award in 2017 for a program MTA called "Light Rail Fare Evasion Prevention Program: Reducing Crime and Fare Evasion." In a press release publicizing this award, MTA highlighted its 13 percent increase in fare sweeps from 2015 to 2016 (780 fare sweeps in 2015 to 885 fare sweeps in 2016). *MDOT MTA Wins National Award for Rail Safety and Security: Agency Recognized for Crime Reduction, Light Rail Fare Evasion Prevention*, June 13, 2017, available at https://www.mta.maryland.gov/articles/158 (last accessed on Nov. 22, 2020), archived at https://perma.cc/4GS9-WXN7. The press release quoted MTA's Chief of Police as saying, "[o]ur message remains clear – that we will not tolerate criminal activity on our transit system…. The Light Rail Fare Evasion Prevention Program is successfully meeting its goal of fighting crime and enforcing the law."

"to see if people paid," to "see if someone has committed a crime by riding the train without paying," and to "investigat[e] to determine if someone broke the law as set by MTA." Carter also points to Corporal Russell's agreement with defense counsel's characterization that "the fare checking also works as an apparatus to be able to check people for warrants as well." Further, Carter relies on the circuit court's statement that the "fare inspection, *albeit investigatory*, was not concentrated on [Carter] personally." (Emphasis added.) Carter claims that this is a factual finding by the circuit court that the purpose of a fare sweep is the "detection of criminal activity." The State responds that Carter's argument and the Court of Special Appeals' holding on this issue are flawed because "Carter and the intermediate appellate court did not rely on any statement of MTA policy or on testimony from any policymaker" in determining the primary purpose of a fare sweep.

Unlike the Court of Special Appeals, we are not persuaded that MTA's "primary purpose" in directing officers to conduct fare sweeps on Light Rail trains is apparent from the record of the suppression hearing. There was no foundational testimony showing that the officers know, as a matter of MTA policy, what the purpose of a fare sweep is, much less the "primary purpose" of this type of fare inspection. Nor did the officers identify any particular purpose of a fare sweep as MTA's primary purpose, or testify that there are no other purposes of a fare sweep beyond those defense counsel asked about.[17]

---

[17] In her concurring opinion, Judge Watts interprets our discussion of the evidence presented at the suppression hearing as providing litigation advice to the State and criticizing Carter's trial counsel. Respectfully, we do neither of these things. We express no view as to how the State (or a defendant) should litigate a special needs case in the future, or as to which arguments we may or may not find persuasive, should another case testing the constitutionality of an MTA fare sweep come before us. Our discussion of the

30

Contrary to Carter's contention, the circuit court's description of the fare sweep as "investigatory" is not a factual finding that the primary purpose of the fare sweep is general crime control. A sobriety checkpoint is also "investigatory" in the sense that officers investigate whether drivers are impaired, and the State prosecutes drivers who are found to be impaired after such investigation. Thus, as *Sitz* and other checkpoint cases demonstrate, the means of a government program may be "investigatory," but the primary purpose of the program nevertheless may be to address a special need beyond the general need for law enforcement. Indeed, if the police-citizen interactions that occur as part of such government programs were not "investigatory," there would be no need to consider whether those programs are constitutional under the special needs exception to the warrant requirement. Of course, after hearing evidence at a suppression hearing, a court may find that the primary purpose of a program of "investigatory" government seizures is general crime control. The determination of a such a program's primary purpose, and ultimately, whether the program passes constitutional muster under the special needs doctrine, depends on the nature and circumstances of the program in question.

In sum, we conclude that the record is insufficient to determine the primary purpose of a fare sweep. Because we do not know the primary purpose of a fare sweep, we also do not know whether it is necessary to undertake the three-part balancing analysis set forth in

officers' testimony as it relates to the special needs issue is necessary to address Carter's appellate argument that the primary purpose of a fare sweep is clear from the record of the suppression hearing. We have explained here why the primary purpose of a fare sweep is not apparent from the testimony of the officers at the suppression hearing, but that is not a criticism of Carter's trial counsel, who had no burden to raise the special needs doctrine at the hearing – and indeed did not raise the issue in the circuit court.

*Brown v. Texas*, 443 U.S. at 51, let alone what the result of that analysis would be. In short, we cannot say one way or the other whether the special needs exception applies to the fare sweep at issue in this case. For this reason, we are unable to adopt the holding of the Court of Special Appeals that the special needs doctrine does not render Carter's seizure constitutional. Nevertheless, it was the State's burden to establish the applicability of the special needs exception at the suppression hearing in this case in order to argue that the seizure of Carter was constitutional on that basis. The State failed to do so. Thus, we will affirm the judgment of the Court of Special Appeals unless the State prevails in its attenuation argument, which we consider next.

## B. Assuming an MTA Fare Sweep Is Not Constitutional Under the Special Needs Doctrine, the State's Attenuation Argument Fails.

The State argues that, even if Corporal Russell seized Carter unlawfully, we nevertheless should affirm the denial of Carter's suppression motion because the discovery of the warrant for Carter's arrest attenuated the taint of the unlawful seizure. In this section of our opinion, we assume that a fare sweep does not pass Fourth Amendment muster under the special needs doctrine,[18] and we reject the State's attenuation argument.

Under the exclusionary rule, a Fourth Amendment violation that results in the discovery of evidence typically warrants suppression of that evidence. *See Mapp v. Ohio*,

---

[18] The State made its attenuation argument to us apparently under the assumption that we would only reach the attenuation issue if we held that the special needs exception does not apply to MTA's program of fare sweeps aboard stationary Light Rail trains. As explained in the previous section of this opinion, we are not deciding in this case whether the special needs doctrine renders MTA fare sweeps constitutional as a general matter. We hold only that the State failed to prove at Carter's suppression hearing that this particular seizure was constitutional. However, because the State bases its attenuation argument in

32

367 U.S. 643, 655 (1961). But, as the Supreme Court has explained, "the significant costs" of the exclusionary rule have led the Court "to deem it applicable only where its deterrence benefits outweigh its substantial social costs." *Utah v. Strieff*, 136 S. Ct. at 2061 (cleaned up). Thus, the Court has recognized several exceptions to the exclusionary rule, one of which is the attenuation doctrine. This exception provides that "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Id.* (internal quotation marks and citation omitted).

In *Brown v. Illinois*, the Supreme Court set forth three factors that courts should consider when determining the applicability of the attenuation doctrine in a particular case: (1) the temporal proximity between the unlawful conduct and the discovery of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Brown*, 422 U.S. at 603-04; *Strieff*, 136 S. Ct. at 2062. Although the third factor is particularly significant, *see Strieff*, 136 S. Ct. at 2062, "no single factor is dispositive." *Cox v. State*, 421 Md. 630, 653 (2011) (internal quotation marks and citations omitted).

We agree with the Court of Special Appeals that, in this case, the first two factors essentially cancel each other out. *See Carter*, 243 Md. App. at 238-39. The discovery of

---

large part on the fact that no court has ever declared MTA's fare sweep program unconstitutional, we find it expedient to assume, for purposes of this section of the opinion only, that the special needs exception does not apply to an MTA fare sweep aboard a stationary Light Rail train.

the gun came within minutes of the fare sweep, which favors suppression. However, the discovery of the open warrant was an intervening circumstance, which cuts against exclusion of the gun. Thus, the applicability of the attenuation doctrine to this case turns on the third factor: the purpose and flagrancy of the assumed police misconduct.

The State contends that the fare sweep – if illegal – is not purposefully or flagrantly illegal, such that the exclusionary rule should apply to the evidence the officers discovered incident to arresting Carter on the open warrant. The State makes three points in support of this position. First, the State notes that a fare sweep only leads to warrant checks for those passengers who are unable to provide proof of payment. In other words, as the State puts it, if a fare sweep "is constitutionally infirm, then the infirmity lies only in the initial announcement of a fare inspection to all passengers – not the detention of an individual passenger whom officers have probable cause to cite for fare evasion, nor to conducting a warrant check on such a fare evader while the citation is prepared." The State cites no authority for the proposition that an illegal warrantless seizure of a group of people should not be deemed flagrant misconduct if it leads to further detention of only those as to whom reasonable suspicion or probable cause develops. Surely, the State would not argue that the taint from a warrantless, suspicionless "dragnet" seizure of 20 people on a city block, so that a drug-sniffing dog could be led by each person, would be attenuated by the fact that the dog only alerted on one of those individuals, who was then detained further and searched, leading to the discovery of drugs on his person. But for the deliberate, illegal seizure at the outset, police would not have developed reasonable suspicion or probable

cause to further detain that one person. In this regard, we see no meaningful distinction between this hypothetical seizure and a fare sweep.

Second, the State compares this case to *Strieff*, in which the Supreme Court held that the discovery of an open warrant attenuated the taint from an illegal seizure that resulted from an officer's negligence.[19] According to the State, the case for attenuation is even stronger here, where the seizure is the product of a policy that has not previously been held unconstitutional. A contrary result, the State suggests, "would have the perverse result that an officer's 'negligent' failure to comply with well-established Fourth Amendment requirements could be saved by the discovery of a warrant, as in *Strieff*, … but that officers' scrupulous adherence to a policy found unconstitutional as an issue of first impression, after decades of practice, would not."

---

[19] In *Strieff*, a narcotics detective stopped Strieff after he left a residence the officer was investigating in connection with alleged drug distribution. 136 S. Ct. at 2059-60. Strieff provided identification to the officer, who then learned that there was an open warrant for Strieff's arrest. The officer arrested Strieff on the warrant and searched him incident to arrest, discovering methamphetamine. *Id.* at 2060. The prosecution conceded that the officer lacked reasonable suspicion to detain Strieff at the outset, but argued that the subsequent discovery of the warrant for Strieff's arrest attenuated the taint of the unlawful seizure. The Supreme Court agreed with the prosecution, reasoning that the Fourth Amendment violation was not purposeful or flagrant. To the contrary, the officer "was at most negligent" in that he "made two good-faith mistakes. First, he had not observed what time Strieff entered the suspected drug house, so he did not know how long Strieff had been there. [The officer] thus lacked a sufficient basis to conclude that Strieff was a short-term visitor who may have been consummating a drug transaction. Second, because he lacked confirmation that Strieff was a short-term visitor, [the officer] should have asked Strieff whether he would speak with him, instead of demanding that Strieff do so…. But these errors in judgment hardly rise to a purposeful or flagrant violation of Strieff's Fourth Amendment rights." *Id.* at 2063.

The State's attempt to shift focus from a policy that requires officers to conduct what, for purposes of argument, we are assuming to be illegal seizures, to the officers' "scrupulous adherence" to that policy, is unavailing. What matters here is the program of regular, frequent, warrantless, and suspicionless seizures that we assume, for purposes of this analysis, are unlawful. This is the type of "systemic or recurrent police misconduct," *Strieff*, 136 S. Ct. at 2063, that warrants suppression of evidence, even where an intervening circumstance has provided an otherwise legitimate basis for the search that yielded the evidence in question. This is especially the case here, where MTA requires officers to run warrant checks on all individuals who are found to have evaded fare payment in the course of a sweep. We reject the State's circular reliance on the discovery of a warrant to attenuate the taint of an illegal agency program that requires officers to search for open warrants as part of the program.

Nor does it matter that a government program of illegal seizures has not previously been held unconstitutional. The State generally does not get a free pass when a court rules against it in the course of breaking new ground in Fourth Amendment jurisprudence.[20] We see no justification for a different approach in this case.

---

[20] An exception occurs when officers rely in good faith on a warrant that turns out not to have been supported by probable cause. *See United States v. Leon*, 468 U.S. 897 (1984). The *Leon* good-faith exception to the exclusionary rule obviously is inapplicable to the warrantless scenario presented here. The State, however, points to *Davis v. United States*, 564 U.S. 229 (2011), in which the Supreme Court relied on *Leon* in holding that the exclusionary rule does not apply where officers conduct a warrantless search in conformance with a then-binding court decision that is subsequently overruled. But *Davis* is not analogous to this case. If, in a prior reported opinion involving a different defendant, the Court of Special Appeals had held that the MTA fare sweep program was constitutional,

36

Finally, the State argues that there is no "deterrence benefit to be gained from ascribing 'flagrant misconduct' to the MTA as an agency at the policy-setting level." The State assures us that, if we were to rule that MTA fare sweeps are unconstitutional, MTA would "learn what is required of it under Fourth Amendment precedent" and would "conform its conduct and policies accordingly… It will not need the 'deterrent' effect of the exclusionary rule to do so." However, the State cites no authority for the proposition that we should analyze the exclusionary rule differently here, where we are concerned with a program of agency-sanctioned seizures, than we do in a Fourth Amendment case of first impression involving an officer's exercise of judgment in the moment. Moreover, we see value in applying the exclusionary rule here (again, assuming the special needs doctrine does not apply to a fare sweep). Our holding reinforces for MTA and all other state and local agencies that they should proceed with caution when implementing a program of warrantless, suspicionless seizures. As the Supreme Court noted in *Strieff*, if that case involved a "dragnet" seizure of multiple individuals without reasonable suspicion, and not just an individual officer's mistaken belief that he had reasonable suspicion to stop Strieff, "the application of the *Brown* factors could be different." *Strieff*, 136 S. Ct. at 2064. We believe the application of the *Brown v. Illinois* factors is different in this case involving a "dragnet" seizure of all passengers aboard a Light Rail train and the requirement to run

---

and MTA carried out the fare sweep at issue here in reliance on that hypothetical prior decision, then this case would be analogous to *Davis*.

warrant checks on all passengers who are found to have evaded fare payment as a result of the seizure.[21]

# IV

## Conclusion

Corporal Russell effected a seizure of Carter without reasonable suspicion when she announced the fare sweep on the Light Rail train in which Carter was a passenger. Carter did not impliedly consent to such a seizure by riding the Light Rail. Assuming the seizure was not constitutional under the special needs doctrine, the discovery of the warrant for Carter's arrest did not attenuate the taint of the unlawful seizure. We affirm the Court of Special Appeals on the foregoing points.

The record before us is insufficiently developed to conclude whether or not Light Rail fare sweeps are constitutional under the special needs doctrine. Because it was the State's burden to establish the constitutionality of Carter's seizure, and the State failed at the suppression hearing to meet that burden, we affirm the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**

---

[21] We do not rule out the possibility that, in a case involving a program of governmental seizures, the attenuation doctrine may apply where the primary purpose of the program is not to detect evidence of ordinary criminal wrongdoing, but where the special needs exception ultimately does not apply to the program based on the application of the *Brown v. Texas* factors.

Circuit Court for Baltimore City
Case No. 117303014
Argued: September 15, 2020

IN THE COURT OF APPEALS

OF MARYLAND

No. 74

September Term, 2019

_____

STATE OF MARYLAND

v.

KENNARD CARTER

_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

_____

Concurring Opinion by Watts, J.

_____

Filed: January 29, 2021

Respectfully, I concur.  I agree with the Majority that officers of the Maryland Transit Administration Police ("the MTA Police") seized Kennard Carter, Respondent, that the implied consent doctrine and the attenuation doctrine do not apply here, and that the State did not satisfy its burden to prove the applicability of the special needs doctrine.  See Maj. Slip Op. at 38.  I cannot, however, join the Majority's decision because it, in *dicta*, gives unnecessary and incorrect advice about how to evaluate testimony regarding the application of the special needs doctrine going forward.  Maj. Slip Op. at 29-30.  Because the Majority concludes that the State failed to meet its burden to establish that the special needs doctrine applies, see Maj. Slip Op. at 38, the Majority's commentary on how it believes the State potentially could have done so, see Maj. Slip Op. at 29-30, is not necessary to the Majority's analysis, is *dicta*, and does not constitute a holding or binding precedent.  In engaging in such *dicta*, the Majority essentially offers the State advice regarding how to prove, in a future case, that there is a special need for fare inspection sweeps.  See Maj. Slip Op. at 29-30.

In addition, my concern is that, in discussing the State's failure to meet its burden in this case, the majority opinion raises the inference that Carter somehow erred in cross-examining law enforcement officers in an attempt to show that the primary purpose of a fare inspection sweep is to advance the general interest in crime control rather than an identifiable special need.  See Maj. Slip Op. at 29-30.  Of equal concern, the majority opinion appears to advise that "foundational testimony" is required before law enforcement officers may be permitted to testify about the primary purpose of the fare inspection sweep, or that, if law enforcement officers are permitted to testify concerning the primary purpose

of the program, such testimony should not be credited without some type of a "foundational" showing. Maj. Slip Op. at 30. The majority opinion also unnecessarily, and one-sidedly, advises that, to the extent Carter alleged that the primary purpose of a fare inspection sweep is "investigatory[,]" the primary purpose of a sweep could nonetheless be to pursue a special need beyond the general interest in crime control. Maj. Slip Op. at 31.[1]

---

[1]Although the Majority denies providing advice to the State and being critical of Carter's counsel, see Maj. Slip Op. at 30 n.17, the denial is inaccurate. Respectfully, a fair reading of the majority opinion is that, just as the concurring opinion says, it unnecessarily provides advice to the State and is critical of Carter's counsel. If it had wished to do so, the Majority could have concluded its discussion of the special needs doctrine by determining that, "[u]nlike the Court of Special Appeals, we are not persuaded that MTA's 'primary purpose' in directing officers to conduct fare sweeps on Light Rail trains is apparent from the record of the suppression hearing." Maj. Slip Op. at 30. The Majority did not need to go into any detail about the purported need for "foundational testimony[,]" Maj. Slip Op. at 30, Carter's counsel's leading questions, see Maj. Slip Op. at 29-30, or the notion that an investigatory government program could nonetheless serve a special need, see Maj. Slip Op. at 31. Gratuitously, however, the Majority discusses all of these points.

The reality is that this Court is not required to negate Carter's argument that the primary purpose of an MTA fare inspection sweep is plain from the record. In other words, to conclude that the MTA fare inspection sweep was not shown to be constitutional under the special needs doctrine, this Court does not have to adopt Carter's contention that the record shows that the primary purpose was the general interest in crime control. Instead, all that is needed is for this Court to determine that the State did not meet its burden to prove that the special needs doctrine applies. It is unnecessary to refute Carter's assertions as to the special needs doctrine, as he has no burden of proof. And, there is no refuting that the Majority does not make a similar critique of the State's arguments concerning a fare inspection sweep, *i.e.*, that a sweep furthers the deterrence and the payment of fares. There is no denying that the State will likely cite the *dicta* in the majority opinion in any future attempt to demonstrate that the primary purpose of a fare inspection sweep is not a general interest in crime control, namely, that a foundation is required for police officer testimony and that a fare inspection sweep, while an investigatory program, may still pursue a special need. In a positive development, though, in responding to the concurrence, the Majority now acknowledges that Carter had no burden of proof, and expressly disavows criticizing his counsel. See Maj. Slip Op. at 30-31 n.17.

In a clear reference to Carter's attempt to cross-examine law enforcement officer witnesses in an effort to show that the primary purpose of a fare inspection sweep is consistent with the general interest in crime control, the majority opinion states:

> [W]e are not persuaded that MTA's "primary purpose" in directing officers to conduct fare sweeps on Light Rail trains is apparent from the record of the suppression hearing. There was no foundational testimony showing that the officers know, as a matter of MTA policy, what the purpose of a fare sweep is, much less the "primary purpose" of this type of fare inspection. Nor did the officers identify any particular purpose of a fare sweep as MTA's primary purpose, or testify that there are no other purposes of a fare sweep beyond those defense counsel asked about.

Maj. Slip Op. at 30 (footnote omitted).

First, neither Carter nor any similarly situated defendant has the burden of persuasion or any burden to call witnesses to establish the primary purpose of a program that the State claims is constitutional under the special needs doctrine, let alone to make a foundational showing for the testimony of witnesses whom they seek to cross-examine in an attempt to demonstrate the primary purpose of a State program that resulted in a seizure. The Majority states that, in support of Carter's contention that the record shows that the primary purpose of a fare inspection sweep is the detecting of ordinary criminal wrongdoing,

> Carter relies on the officers' agreement with defense counsel's leading questions suggesting that the purpose of checking for proof of payment in a fare sweep is "to see if people paid," to "see if someone has committed a crime by riding the train without paying," and to "investigat[e] to determine if someone broke the law as set by MTA." Carter also points to Corporal Russell's agreement with defense counsel's characterization that "the fare checking also works as an apparatus to be able to check people for warrants as well."

Maj. Slip Op. at 29-30 (alteration in original). To the extent that the Majority writes that

- 3 -

law enforcement officers responded to Carter's counsel's leading questions and that the officers' testimony lacked any foundation, it must be pointed out that Carter had no obligation to prove anything, and that finding fault with his counsel for asking leading questions on cross-examination, or implying that Carter failed to supply a "foundational" basis for the law enforcement officer's testimony, Maj. Slip Op. at 30, is just plain wrong. What is more perplexing is that the Majority chose to do this. The analysis of the applicability of the special needs doctrine in this case is straightforward—the State had the burden to prove the applicability of the special needs doctrine as an exception to the requirement for reasonable suspicion or probable cause to seize Carter, and the State failed to do so. That is the beginning and the end of the story.

That Carter was represented by trial counsel who chose to cross-examine law enforcement officers to preempt or counter an anticipated argument by the State that Carter's seizure was constitutional under the special needs doctrine does not, as the majority opinion implies, transfer the burden of proof to Carter. The critical part of the analysis concerning the special needs doctrine is that, in the circuit court, the State never raised an issue as to the special needs doctrine or the primary purpose of the fare inspection sweep. See Maj. Slip Op. at 25. Of course, a defendant would be motivated to attempt to cross-examine law enforcement officers to demonstrate that, insofar as the special needs doctrine is concerned, the purpose of the program at issue is the pursuit of the general interest in crime control, but the defendant is not required to do so.

This is not a situation in which an appellate court is unable to tell the primary purpose because, somehow, Carter failed to present witnesses with an adequate foundation,

- 4 -

or his counsel asked improper leading questions; this is a situation in which the State failed to meet its burden. Carter had no burden to call any witnesses with respect to the applicability of the special needs doctrine, let alone call witnesses and make a foundational showing as to the testimony of the witnesses. At the suppression hearing, unless a valid objection had been lodged—and it was not—Carter was free to cross-examine the State's witnesses, who were law enforcement officers, and those witnesses were free to testify, regarding the purpose of their participation in fare inspection sweeps without any foundational showing.

The majority opinion also advises that, although Carter alleges that the police action at issue was investigatory, the primary purpose of the program may still be found to satisfy a special need. See Maj. Slip Op. at 31. This is information that will undoubtedly be helpful to the State to prove, in a future case, that there is a special need for fare inspection sweeps. Specifically, the majority opinion states:

> Contrary to Carter's contention, the circuit court's description of the fare sweep as "investigatory" is not a factual finding that the primary purpose of the fare sweep is general crime control. A sobriety checkpoint is also "investigatory" in the sense that officers investigate whether drivers are impaired, and the State prosecutes drivers who are found to be impaired after such investigation. Thus, as *Sitz* and other checkpoint cases demonstrate, the means of a government program may be "investigatory," but the primary purpose of the program nevertheless may be to address a special need beyond the general need for law enforcement.

Maj. Slip Op. at 31. As to the other side of the analysis, the majority opinion simply goes on to state: "Of course, after hearing evidence at a suppression hearing, a court may find that the primary purpose of a program of 'investigatory' government seizures is general crime control." Maj. Slip Op. at 31. With this single sentence, the Majority gives short

shrift to the circumstance that an investigatory program could in actuality be one that pursues a general interest in crime control. Moreover, the Majority does not in any way describe the circumstance that, although the State may contend that an investigatory program has a primary purpose that exceeds the general interest in crime control under Michigan Dep't of State Police v. Sitz, 496 U.S. 444 (1990), the program may still be found to indeed further an interest in crime control.

As to the State's contention, the Majority states:

> [A]ccording to the State, the primary purpose of a fare sweep is not to further a general crime-control interest, but rather to deter fare evasion on the Light Rail, thereby promoting fare payment. As support for this contention, the State asks us to consider the nature of a barrier-free transit system such as the Light Rail, asserting that such a system depends on fare inspections to sustain itself.

Maj. Slip Op. at 26. Unlike with the points raised by Carter, the Majority does not go to the length of pointing out that the position taken the State may be incorrect. In the interest of providing balance lacking in the majority opinion, I provide the following thoughts about the State's argument concerning deterrence. Although the State argues otherwise, deterring the crime of fare evasion may be found to advance the ordinary interest in crime control. By statute, fare evasion is a crime that carries a fine, and, under certain circumstances, a non-paying passenger may be arrested, and in practice with MTA fare inspections sweeps non-paying passengers on the Light Rail were routinely seized and subjected to the issuance of citations and warrant checks. It is clear that alleging deterrence to promote fare payment as the primary purpose of a fare inspection sweep would not necessarily bring a fare inspection sweep within the special needs exception.

In addition, from my perspective, although promoting fare payment in general may be a benefit of deterring fare evasion, it may be collateral to the primary purpose of the fare inspection sweep, which, as identified by the State, is deterring fare evasion. In <u>Sitz</u>, 496 U.S. at 447-48, the Supreme Court upheld a sobriety checkpoint, where the arrest of drunk drivers was involved, on the ground that the primary purpose of the checkpoint was to promote highway safety. In <u>Sitz</u>, the law enforcement activity of arresting a person for drunk driving was directly related to the primary purpose or goal of promoting highway safety. The difference here is that citing or arresting a person for fare evasion during a fare inspection sweep does nothing to immediately or directly promote fare payment by the general public. Any benefit in the area of promoting payment of fares and more broadly, as the State alleges, providing "a barrier-free transit system" may be speculative and occur only on the assumption that members of the public somehow become aware of the existence of fare inspection sweeps and thereby in the future pay a fare that they otherwise would not have paid as a result. In other words, any benefit in terms of promoting fare payment and the existence of a barrier-free transportation system may be uncertain and clearly attenuated from the act of conducting a fare inspection sweep; accordingly, despite whatever the State may say, and the majority opinion may leave unsaid, deterring fare evasion may not be distinct from pursuing a general interest in crime control.

In closing, the Majority unnecessarily gives advice to the State, criticizes Carter's counsel, and implies that Carter failed to lay a foundation for the State's witnesses' testimony that the purpose of a fare inspection sweep is to determine whether members of the public have committed a crime. <u>See</u> Maj. Slip Op. at 30. To the extent that the majority

- 7 -

opinion implies that Carter had the burden to lay such a foundation, or that any law enforcement officer needs such a foundation to testify, such an implication is merely *dicta* and indeed in this case is wrong. For these reasons, I do not join the majority opinion but rather I concur.