IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 81203-3-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ZACHERY KYLE MEREDITH, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |
| | ) | |

VERELLEN, J. — Article 1, section 7 of the Washington constitution prohibits warrantless seizures, save for narrow exceptions. Consent is one well-established exception. By boarding a public bus and accepting transportation, Zachery Meredith consented to the conditions of ridership. Those conditions include paying bus fare and complying with a fare enforcement officer's request for proof of payment. Even assuming that Meredith was seized when an officer requested that he provide proof of payment, the officer's request remained within the scope of Meredith's consent. Because Meredith consented to the conditions of ridership and failed to provide proof of payment when requested, the trial court did not err by denying Meredith's motion to suppress evidence gathered by the officer conducting fare enforcement.

Therefore, we affirm.

FACTS

Zachery Meredith was riding the Swift regional transit bus in Everett late one morning when two officers from the Snohomish County Sheriff's Office boarded to conduct fare enforcement. When conducting fare enforcement, officers would board a bus at a stop and then ask individual passengers for proof of payment while the bus was driving from one stop to the next. A "chase vehicle" would follow the bus to help with identifying and processing anyone ordered off the bus for nonpayment.

Officer Timothy Dalton moved to the back of the bus and began working his way forward and saying "proof of payment or ORCA card" to each passenger in a conversational tone. His partner moved to the front of the bus and worked backward. The bus drove to its next stop while the officers checked for proof of payment. Officer Dalton requested "proof of payment or ORCA card" from Meredith, who began to check his pants and backpack. Meredith could have provided proof of payment either by showing a ticket purchased from a fare machine at a bus stop or by providing an ORCA fare card for the officer to scan with a digital reader. Failure to provide proof of payment could result in a notice of infraction or arrest. The bus continued along its route, and Meredith searched for four or five minutes without producing proof of payment. Officer Dalton ordered him to disembark at the next stop, and they left the bus together.

Officer Dalton asked Meredith for his name and identification. Meredith said he was from Colorado and his name was "Jason McGumery." Officer Dalton

2

radioed dispatch to run the name, and it produced no returns in either Washington or Colorado.  Officer Dalton suspected McGumery was a fake name, so Officer Luis Zelaya arrived to help determine Meredith's identity.  Officer Zelaya used a mobile fingerprint reader to scan Meredith's prints and then learned Meredith's real name and that he had two outstanding felony warrants.  Meredith was arrested on the outstanding warrants and on probable cause of having committed third degree theft of services for nonpayment of fare.  He was charged with making a false statement to a public servant.

Pretrial, Meredith moved to suppress evidence resulting from Officer Dalton's fare enforcement.  Meredith argued the fare enforcement statute for regional transit authorities, RCW 81.112.210, was unconstitutional under both article I, section 7 of the state constitution and the Fourth Amendment because it authorized a warrantless seizure without lawful justification: Officer Dalton's request for proof of payment.  The trial court denied the motion.

A jury found Meredith guilty of making a false statement.  The superior court affirmed his conviction on RALJ appeal, concluding Meredith had not been unlawfully seized.

Meredith sought discretionary review.  A commissioner of this court granted review pursuant to RAP 2.3(d)(3) to consider the constitutionality of RCW 81.112.210 related to Officer Dalton's initial contact with Meredith by

requesting proof of payment or an ORCA card.[1]  Following oral argument, the

parties were asked to provide supplemental briefing.

## ANALYSIS

Meredith contends Officer Dalton violated article I, section 7 of the

Washington Constitution and the Fourth Amendment by effectuating an

unauthorized, warrantless seizure when he requested proof of payment or an

ORCA card.[2]  We presume statutes are constitutional and review challenges to

their constitutionality de novo.[3]  Meredith has the burden of proving the statute is

unconstitutional.[4]

Meredith does not specify which portion of the statute is unconstitutional.

He appears to challenge subsection RCW 81.112.210(2)(b)(i),[5] which states:

---

[1] Given the scope of discretionary review, we do not consider any issues regarding Officer Dalton's conduct after his initial contact.

[2] Amici ACLU of Washington and Washington Appellate Project rely upon a wide range of evidence from outside the record to urge us to consider the social impacts of punitive fare enforcement on people of color and people experiencing poverty.  Meredith is a Caucasian man with reddish, blond hair.  The record does not indicate whether poverty influenced his ability to pay bus fare.  While race and poverty could influence punitive fare enforcement and magnify its impacts, amici raise issues beyond the scope of this case.  And aside from a passing assertion that the fare enforcement statute is unconstitutional, amici also fail to address the issue on appeal.  Thus, we decline to consider their arguments.  See Ctr. for Envtl. Law & Policy v. Dep't of Ecology, 196 Wn.2d 17, 36 n.14, 468 P.3d 1064 (2020) (no need to consider issues raised solely by amicus) (quoting State v. James-Buhl, 190 Wn.2d 470, 478 n.4, 415 P.3d 234 (2018)).

[3] State v. Villela, 194 Wn.2d 451, 456, 450 P.3d 170 (2019) (quoting State v. Lanciloti, 165 Wn.2d 661, 667, 201 P.3d 323 (2009)).

[4] Id.

[5] Both RCW 81.112.210 and .220 were amended during the pendency of this appeal.  LAWS OF 2021, ch. 70, §§ 1-2.  These amendments will become

"(b) In addition to the specific powers granted to enforcement officers under RCW 7.80.050 and 7.80.060, persons designated to monitor fare payment also have the authority to take the following actions: (i) Request proof of payment from passengers." When a passenger does not provide proof of payment, a fare enforcement officer is authorized to issue a civil infraction, to demand identification from the passenger, and to remove the passenger from the bus.[6] A police officer conducting fare enforcement can also exercise police powers and is not limited to these actions.[7]

Article I, section 7 provides: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." The State contends no constitutional violation occurred because there is no privacy interest in whether a bus passenger has paid their fare. But article I, section 7 protects against unauthorized seizures by government, despite not using the word "seize."[8] When a warrantless seizure occurs in a crowded public place, it could violate article I,

_____

effective as of July 25, 2021. Because the amendments have no impact on our analysis, we cite to the law currently in effect.

[6] RCW 81.112.210(2)(b)(ii)-(iv).

[7] See State v. K.L.B., 180 Wn.2d 735, 744, 328 P.3d 886 (2014) ("[Fare enforcement officers] do not exercise all powers police officers have. In essence, they can check riders to verify valid tickets exist and eject passengers who have not paid. Anything more and the [fare enforcement officer] summons the police."); Clerk's Papers (CP) at 238 (Officer Zelaya explaining "what we do for failure to pay fare is considered a misdemeanor violation. It's a theft 3. . . . If we can't identify [a person who did not provide proof of payment], then we will usually transport them to jail, [and] charge them with the theft so we can get them positively identified.").

[8] State v. Carriero, 8 Wn. App. 2d 641, 654, 439 P.3d 679 (2019) (citing State v. Harrington, 167 Wn.2d 656, 663, 222 P.3d 92 (2009)).

section 7 regardless of whether the government also intruded on a person's "private affairs."[9]

Here, Meredith does not allege his privacy was violated, explaining "the issue is not whether Mr. Meredith was searched, but whether he was seized."[10] We assume without deciding that Officer Dalton's request was a seizure of Meredith. But when the alleged seizure takes the form of asking a person to provide proof of payment on public transit, the application of article I, section 7 does not depend upon the "privacy" of the information requested. Because a person can be unlawfully seized without a violation of their privacy, the State's argument is unavailing.

Typically, article I, section 7 provides greater protection against seizures than the Fourth Amendment.[11] But when determining whether a public

---

[9] Compare State v. Muhammed, 194 Wn.2d 577, 586, 451 P.3d 1060 (2019) (considering whether "government conduct intrude[d] on a private affair" when the defendant alleged a search of his cellphone data violated article I, § 7); State v. Puapuaga, 164 Wn.2d 515, 520-25, 192 P.3d 360 (2008) (analyzing whether a defendant whose property was seized as part of an inventory search had a privacy interest in the property), with State v. Ladson, 138 Wn.2d 343, 349-59, 979 P.2d 833 (1999) (not considering whether a defendant's private affairs were intruded upon when the defendant alleged a pretextual traffic stop was an unlawful seizure in violation of article I, § 7).

[10] Reply Br. at 1-2.

[11] See State v. Young, 135 Wn.2d 498, 510, 957 P.2d 681 (1998) ("Given the erosion of privacy the [California v.] Hodari D., [499 U.S. 621, 628, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991),] decision entails, we adhere to our established jurisprudence and reject application of the test for a seizure articulated in Hodari D. to a disturbance of private affairs under article I, section 7."); see also State v. Z.U.E., 183 Wn.2d 610, 618, 352 P.3d 796 (2015) ("[B]ecause article I, section 7 provides broader privacy protections than the Fourth Amendment, our state

transportation passenger was seized, they provide the same degree of protection.[12] The critical question is whether, viewed objectively, a reasonable, innocent person approached by law enforcement "'would feel free to decline the officers' requests or otherwise terminate the encounter.'"[13] Assuming without deciding that Officer Dalton's initial request constituted a warrantless seizure,[14] the

---

constitution generally requires a stronger showing by the State.") (citing State v. Acrey, 148 Wn.2d 738, 746-47, 64 P.3d 594 (2003)).

[12] See United States v. Drayton, 536 U.S. 194, 201-02, 122 S. Ct. 2105, 153 L. Ed. 2d 242 (2002) (explaining the Fourth Amendment seizure analysis adopted in Hodari D., 499 U.S. at 628, "is not an accurate measure of the coercive effect of a bus encounter") (citing Florida v. Bostick, 501 U.S. 429, 435-36, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991)); Carriero, 8 Wn. App. 2d at 654 (explaining that an article I, § 7 seizure analysis aligns with a Fourth Amendment seizure analysis, except for the analysis in Hodari D.).

[13] Drayton, 536 U.S. at 202 (quoting Bostick, 501 U.S. at 436); accord Carriero, 8 Wn. App. 2d at 655 ("police contact constitutes a seizure only if, due to an officer's use of physical force or display of authority, a reasonable person would not feel free to leave, terminate the encounter, refuse to answer the officer's question, decline a request, or otherwise go about his business") (citing State v. Thorn, 129 Wn.2d 347, 353, 917 P.2d 108 (1996)).

[14] We note that Meredith urges us to rely upon individual seizure cases, such as State v. Villela, 194 Wn.2d 451, 454-55, 450 P.3d 170 (2019), and State v Thorp, 71 Wn. App. 175, 177, 856 P.2d 1123 (1993), to determine whether a seizure occurred here. For purposes of a seizure analysis, an individual vehicle occupant or pedestrian is legally distinguishable from a bus or train passenger because the settings are factually distinct. See 4 WAYNE R. LEFAVE, SEARCH AND SEIZURE § 9.4(c), at 447 (4th ed. 2004) ("[T]he bus passenger is in a unique position, unlike that confronted by the pedestrian or by traveler at an airport."); see also Brendlin v. California, 551 U.S. 249, 262 n.6, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007) (when evaluating if a seizure occurred, noting "the relationship between driver and passenger is not the same in a common carrier as it is in a private vehicle, and the expectations of police officers and passengers differ accordingly"). Although general principles can overlap, we decline Meredith's invitation to analogize bus passengers with individuals in private vehicles.

question is whether it was authorized by one of "'a few jealously and carefully drawn exceptions.'"[15]  The State has the burden of proving an exception applied.[16]

"In a society based on law, the concept of agreement and consent should be given a weight and dignity of its own."[17]  A valid consent is a well-recognized exception to the warrant requirement for a seizure.[18]  The totality of the

---

[15] Ladson, 138 Wn.2d at 349 (internal quotation marks omitted) (quoting State v. Hendrickson, 129 Wn.2d 61, 70, 917 P.2d 563 (1996)).

[16] Id. at 350 (citing Hendrickson, 129 Wn.2d at 71).

[17] Drayton, 536 U.S. at 207.

[18] See State v. Reichenbach, 153 Wn.2d 126, 131, 101 P.2d 80 (2004) (noting consent is an exception to the general prohibition on warrantless searches and seizures) (citing Hendrickson, 129 Wn.2d at 70-71); see, e.g., United States v. Scroggins, 599 F.3d 433, 443-46 (5th Cir. 2010) (concluding the Fourth Amendment allowed a warrantless detention of a suspect inside his home because, in part, his fiancé provided valid consent for police to enter); State v. Carter, 472 Md. 36, 58, 244 A.3d 1041 (2021) ("Consent to a search or seizure is a recognized exception to the warrant requirement.") (citing Schneckloth v. Bustamonte, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973); Jones v. State, 407 Md. 33, 51, 962 A.2d 393 (2008)); People v. Gardner, 45 A.D.3d 1371, 1371, 844 N.Y.S.2d 803 (N.Y. App. Div. 2007) (holding warrantless arrest of a defendant in a third party's home was authorized when the third party consented to police entering the home) (citing People v. Long, 124 A.D.2d 1016, 1017, 508 N.Y.S.2d 774 (1986)); State v. Kearns, 75 Haw. 558, 568-69, 867 P.2d 903 (1994) (noting the warrant requirement in art. I, § 7 of the Hawaii constitution allows warrantless investigatory seizures if the individual consents) (citing State v. Quino, 74 Haw. 161, 173-75, 840 P.2d 358 (1992)); cf. United States v. Shrum, 908 F.3d 1219, 1231 (10th Cir. 2018) (Fourth Amendment can allow warrantless seizure of a home with valid consent) (citing Coolidge v. New Hampshire, 403 U.S. 443, 474-75, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971)); United States v. Garces, 133 F.3d 70, 74 (D.C. Cir. 1998) ("A warrantless seizure [of property] may be validated by the consent of someone with authority over the property.") (citing United States v. Matlock, 415 U.S. 164, 170-71, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974)); State v. Bustamante-Davila, 138 Wn.2d 964, 982-83, 983 P.2d 590 (1999) (concluding art. I, § 7 was not violated when a federal agent had authority to seize a firearm within an undocumented immigrant's home without a warrant because the firearm was in plain view, it was illegal for him to possess, and he implicitly consented to the officers' entry).

circumstances determines whether consent was valid.[19]

Meredith asserts, however, that article I, section 7 does not recognize consent as a valid exception to seizure of a person. He cites City of Seattle v. Mesiani[20] and State v. Thorp[21] to argue consent cannot be an exception in Washington because article I, section 7 authorizes seizure of a person only when a police officer has a warrant or "individualized suspicion to believe the individual is engaged in unlawful activity."[22]

Neither Mesiani nor Thorp support his assertion. Mesiani noted article I, section 7 allows "narrow exceptions to the warrant requirement,"[23] but it did not consider a consent exception because "[n]o argument has been presented to this court that would bring the [sobriety] checkpoint program within any possible interpretation of the constitutionally required 'authority of law.'"[24] Thorp discussed consent only as it related to the administrative search exception for pervasively regulated businesses and did not consider whether consent could authorize a warrantless seizure in another setting.[25]

---

[19] State v. O'Neill, 148 Wn.2d 564, 588, 62 P.3d 489 (2003) (citing Bustamante-Davila, 138 Wn.2d at 981; State v. Jensen, 44 Wn. App. 485, 488, 723 P.2d 443 (1986)).

[20] 110 Wn.2d 454, 755 P.2d 775 (1988).

[21] 71 Wn. App. 175, 856 P.2d 1123 (1993).

[22] Appellant's Supp. Br. at 3.

[23] 110 Wn.2d at 457.

[24] Id. 458.

[25] 71 Wn. App. at 179-80. In a footnote, Meredith cites to Jacobsen v. City of Seattle, 98 Wn.2d 668, 674, 658 P.2d 653 (1983), to assert that "[t]he Supreme Court of Washington has even expressed doubt as to whether consent is [an]

By contrast, in Farkas v. Williams, the Ninth Circuit concluded a civilian entering a naval base to speak with naval criminal investigative service officers consented to his seizure upon entry.[26] The civilian alleged a seizure occurred because base security required that he store his wallet and other personal items in a lockbox before entering.[27] To enter the base, the civilian passed the "typical trappings" of a military base, such as barbed wire fencing, warning signs, and guarded gates.[28] And the civilian agreed to place his belongings in the lockbox before voluntarily entering.[29] The "objective circumstances" demonstrated the civilian "impliedly consented to the possibility of a Fourth Amendment intrusion," so no constitutional violation occurred.[30] Although Farkas is a Fourth Amendment decision, we find the same logic applicable to article 1, section 7 in this setting of

exception to the warrant requirement for searches of the general public." Appellant's Supp. Br. at 1, n.1. The Jacobsen court stated, "Parenthetically, we note that even if the consent issue had been raised by defendants it is extremely doubtful, given the circumstances of this case, that they could have prevailed." 98 Wn.2d at 674. But this stray comment was irrelevant to the resolution of the issues before the Jacobsen court, making it nonbinding dicta. See Johnson v. Liquor & Cannabis Bd., 197 Wn.2d 605, 486 P.3d 125, 133-34 (2021) ("'Statements in a case that do not relate to an issue before the court and are unnecessary to decide the case constitute obiter dictum, and need not be followed.'") (internal quotation marks omitted) (quoting In re Pers. Restraint of Domingo, 155 Wn.2d 356, 366, 119 P.3d 816 (2005)). Even if it were not, the circumstances of Jacobsen are inapposite because the concert patrons in that case were unaware of the possibility of police officers searching or seizing their personal belongings prior to it occurring. 98 Wn.2d 670.

[26] 823 F.3d 1212, 1216 (9th Cir. 2016).

[27] Id. at 1213.

[28] Id. at 1216.

[29] Id.

[30] Id. at 1216-17.

public transportation. Especially where the alleged seizure consists of asking an individual to provide proof of payment for transit, impliedly agreeing to provide proof of payment upon request falls within the consent exception. Because it is well-established that a person can consent to a seizure and Meredith fails to provide contrary authority, his assertion is not persuasive.

To determine whether Meredith validly consented to being seized, we consider whether his consent was voluntary, whether the seizure was limited to the scope of the consent granted, and whether consent was granted by a party with authority to do so.[31] We consider only the first two prongs because Meredith does not allege authority to consent was missing. We determine whether consent was voluntary by considering the totality of the circumstances from the perspective of a reasonable—meaning innocent—person.[32]

Meredith chose to ride the bus. As explained to the superior court, he "was simply riding a bus like any other citizen."[33] A contractual relationship forms between the operator of a bus and person choosing to ride it "when a person, intending to become a passenger and pay his fare when demanded, having the

_____

[31] See State v. Blockman, 190 Wn.2d 651, 658, 416 P.3d 1194 (2018) (discussing consent to search) (citing State v. Hastings, 119 Wn.2d 229, 234, 830 P.2d 658 (1992)).

[32] Reichenbach, 153 Wn.2d at 132 (citing Bustamante-Davila, 138 Wn.2d at 981-82); see Drayton, 536 U.S. at 202 (to determine whether a person consented to be stopped and searched, courts apply the "reasonable person test," which "is objective and 'presupposes an innocent person.'") (quoting Bostick, 501 U.S. at 437-38).

[33] CP at 50.

means to do so, is permitted to board the coach."[34] As Professor LeFave explains when discussing bus seizures, a reasonable passenger knows that only those authorized by the carrier, such as bus personnel and paying ticket holders, are permitted on board.[35] As a reasonable passenger choosing to ride the bus, Meredith voluntarily entered into a contract with Swift transit: he would follow the applicable rules of ridership in return for transportation.[36] Because the Swift bus is operated by a regional transit authority, chapter 81.112 RCW applied. RCW 81.112.220(1) creates duties for passengers. It states that passengers on a Swift bus "shall pay the fare established" and "shall produce proof of payment when requested by a person designated to monitor fare payment."[37] RCW 81.112.220(2) warns that failure to pay could result in a civil infraction and in being ordered off the bus pursuant to RCW 81.112.210(1). Meredith chose freely to contract with Swift for transportation services and, accordingly, chose to comply with RCW 81.112.220(1).

---

[34] Fleming v. City of Seattle, 45 Wn.2d 477, 481, 275 P.2d 904 (1954) (citing Gulf, M. & N. R. Co. v. Bradley, 167 Miss. 603, 142 So. 493 (1932); Broyles v. Central of Ga. Ry. Co., 166 Ala. 616, 52 So. 81 (1909)). Of course, if someone lacked the ability to pay and still intentionally boarded and rode a bus that required fare payment, a contract could still form between passenger and operator. See Ebling v. Gove's Cove, Inc., 34 Wn. App. 495, 499, 663 P.2d 132 (1983) ("A bilateral contract is one in which there are reciprocal promises. The promise by one party is consideration for the promise by the other. Each party is bound by his promise to the other.") (citing Cook v. Johnson, 37 Wn.2d 19, 23, 221 P.2d 525 (1950); Higgins v. Egbert, 28 Wn.2d 313, 182 P.2d 58 (1947)).

[35] 4 LE FAVE, SEARCH AND SEIZURE, § 9.4(c), at 443 (citing United States v. Rembert, 694 F. Supp. 163 (W.D.N.C. 1988)).

[36] Fleming, 45 Wn.2d at 481.

[37] RCW 81.112.220(1).

Officer Dalton approached Meredith and requested proof of payment. When Meredith failed to produce proof of payment after his lengthy search of his pockets and backpack, Officer Dalton ordered him off the bus and requested proof of identification. At each step, Officer Dalton's conduct remained within the scope of Meredith's consent to the duties resulting from his decision to contract with Swift Transit.

Critical differences between the circumstances here and those in a recent case from Maryland illustrate why Meredith provided valid consent to a seizure. In State v. Carter, the Court of Appeals of Maryland, which is the state's highest court, held that a passenger had not consented to a seizure while aboard Baltimore Light Rail.[38] As with the Swift Transit bus here, Baltimore Light Rail is a barrier-free system with no turnstiles or requirement to provide proof of payment before boarding.[39] Police are authorized to conduct fare enforcement, and a passenger who fails to produce proof of payment can be issued a citation or charged with a misdemeanor.[40]

Police officers were conducting fare enforcement through a "fare sweep" when a rider told an officer he did not have a ticket.[41] After being told to disembark and provide his identification, another officer discovered an outstanding

---

[38] 472 Md. 36, 45-46, 244 A.3d 1041 (2021).

[39] Id. at 44.

[40] Id. at 47.

[41] Id. at 44.

warrant.[42] While arresting the rider on the warrant, officers discovered the rider

was carrying a gun and cocaine.[43] The rider was charged with a firearms charge

and possession of cocaine, among others.[44] The rider moved to suppress

evidence, arguing the fare sweep constituted an unlawful seizure.[45] The trial court

denied the motion, and the rider was convicted.[46]

The Court of Appeals's analysis focused on the nature of the enforcement.

The "fare sweep" involved multiple police officers simultaneously boarding every

car of the train within seconds of its arrival at the station.[47] Passengers were not

allowed to disembark the train during the sweep, and the train would not continue

its journey until after the sweep was completed.[48] Any passenger without proof of

payment would be ordered off the train, issued a citation, and have a warrant

check run on them.[49]

The court concluded the rider did not voluntarily consent because he lacked

notice of the possibility of the sweep.[50] It explained a reasonable passenger would

expect to be required to provide proof of payment, but nothing suggested to the

---

[42] Id. at 48.

[43] Id.

[44] Id.

[45] Id.

[46] Id. at 50-51.

[47] Id. at 47.

[48] Id. at 57, 62.

[49] Id. at 48-49.

[50] Id. at 62.

passengers that their entire train could be detained for as long as officers deemed necessary to check for proof of fare payment from each of them.[51] Because the fare sweep constituted a warrantless and unauthorized seizure, the court concluded the evidence should have been suppressed.[52] Notably, the court identified "a significant difference between a team of armed officers seizing an entire train of passengers while the train is stopped at a station, and an individual [Maryland Transit Administration] officer or civilian fare inspector asking passengers to show proof of fare payment while a train is traveling between stations."[53]

Here, Meredith freely chose to contract with Swift Transit for transportation. He agreed to pay and provide proof of payment. And as a reasonable rider, he necessarily understood his duty to pay his fare and provide proof of payment when asked.[54] Thus, like the civilian base visitor in Farkas, Meredith was aware of the possible seizure of his person and consented to it.[55]

---

[51] Id. at 61 n.9, 61-62.

[52] Id. at 76.

[53] Id. at 62.

[54] Id.; see Drayton, 536 U.S. at 202 (whether seizure occurred is viewed from perspective of a reasonable, meaning innocent, person).

[55] Meredith analogizes to Carter, arguing he had no notice he was "subject to a suspicionless seizure." Appellant's Supp. Br. at 10. But a reasonable bus passenger does not expect a free ride any more than he would expect to be seized for an unknown duration for officers to investigate other passengers' failures to pay their fares. Because the unreasonable, unlimited fare sweep in Carter is distinguishable from the limited, foreseeable stop conducted here, Meredith's analogy is unconvincing.

Unlike <u>Carter</u>, Officer Dalton's request for "proof of payment or ORCA card" remained within the scope of consent. RCW 81.112.220(1) obligated Meredith to pay bus fare and produce proof of payment upon request, and Officer Dalton's request did not exceed this obligation. Also unlike <u>Carter</u>, the alleged seizure was reasonable, occurring while the bus was in transit, and nothing suggests passengers were prohibited from exiting at a stop or otherwise detained when not speaking with an officer.

Meredith argues our conclusion would make the protections of article I, section 7 "obsolete . . . if members of the public are found to consent to unfettered government intrusion whenever a statute indicates law enforcement may arbitrarily and [without suspicion] seize them to investigate whether they are engaged in unlawful activity."[56] But this misunderstands both the circumstances of this case and the consent exception. First, for purposes of a seizure analysis, a passenger of a common carrier, such as a public bus or train, is legally distinct from a pedestrian or a person in a private automobile.[57] Second, the consent exception applies because Meredith chose to contract with Swift Transit for transportation, not because a statute provided Officer Dalton the authority to enforce Meredith's duties. Regardless, in this setting, neither the Fourth Amendment nor article I,

---

[56] Appellant's Supp. Br. at 3.

[57] <u>Brendlin</u>, 551 U.S. at 262 n.6; <u>see</u> <u>Drayton</u>, 536 U.S. at 201-02 (explaining why the seizure analysis for a pedestrian or driver of a private vehicle is distinct from the seizure analysis for a bus passenger).

section 7 authorize a warrantless stop as a pretext for a law enforcement purpose.[58] Meredith's arguments are not persuasive.

Meredith voluntarily consented to Officer Dalton's initial contact. He has not challenged any of Officer Dalton's subsequent conduct, so we do not consider it. Because Meredith consented to being asked to provide proof of fare payment and a valid consent provides authority of law for such a request, even if the request is deemed a seizure under article I, section 7, the superior court did not err by affirming Meredith's conviction on RALJ appeal.

Therefore, we affirm.

_____

WE CONCUR:

_____    _____
Chun, J.                    Andrus, A.C.J.

---

[58] United States v. Orozco, 858 F.3d 1204, 1210-16 (9th Cir. 2017); Ladson, 138 Wn.2d at 352-53.